Larry D. STEWART, et al., Plaintiffs,

v.

Robert E. RUBIN, Secretary Department of the Treasury, Defendant.

Civil Action No. 90–2841 (RCL).

United States District Court,
District of Columbia.

Nov. 21, 1996.

David J. Shaffer, James W. Morrison, Arter & Hadden, Washington, DC, for plaintiffs.

Roderick L. Thomas, Assistant U.S. Attorney, Washington, DC, for defendant.

Jose M. Herrera, Miami, FL, for movant—AFT Hispanic Agents Association.

Thomas E. Clay, P.S.C., Louisville, KY, for classmember—Elsie K. Davenport.

Robeert E. Sanders, Washington, DC, for movants—James L. Jorgensen, Vincent C. Noble, Leonora Magaletta, Michael S. Russell, Richard Issa, Frank Napoli.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBERTH, District Judge.

## I. FINDINGS OF FACT

A. *Findings As to Fairness and Class Certification*

1. This class action lawsuit was brought against the U.S. Department of Treasury's Bureau of Alcohol, Tobacco, and Firearms ("ATF"), under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e–16 *et seq.* Plaintiffs, fifteen (15) current and former African–American GS–1811 series Special Agents,[1] allege class-wide racial discrimination and retaliation by ATF in a variety of personnel practices. Specifically, Plaintiffs allege that ATF discriminated on the basis of race in promotions, discipline, awards, assignments (including undercover assignments), special teams, Schedule A hiring,[2] hostile work environment, terminations, employment performance evaluations, training assignments, and retaliated against them for their equal employment opportunity ("EEO") activities. Plaintiffs allege both a disparate impact and disparate treatment case. As relief, Plaintiffs seek widespread injunctive relief, retroactive promotions and tenure, back pay, compensatory damages and attorneys' fees and costs.

2. This case was filed in this Court in November of 1990 on behalf of two African–American ATF Special Agents, Larry D. Stewart and Mark Jones. Plaintiffs sought leave to file an Amended Complaint in January 1993, adding thirteen more named Plaintiffs and including additional alleged discriminatory acts and practices. This Court granted Plaintiffs' Motion to Amend. Extensive discovery was undertaken by the parties, including written discovery and the depositions of all fifteen named Plaintiffs, the then-current Director of ATF and the statistical experts. In July 1994, the Plaintiffs filed their Motion for Class Certification, which was supported by statistical analysis, expert reports and the affidavits of about fifty (50) African–American ATF Special Agents. The Defendants also filed a comprehensive opposition to Class Certification that was supported by expert reports and statistical analysis.

3. In August 1994, the Court referred the case to the District Court's Alternative Dispute Resolution program ("ADR"). Early in the mediation, ATF decided to hire an outside expert to assist the agency to revise

---

1. "GS–1811" is the Office of Personnel Management's ("OPM") classification number for special agents (*i.e.*, criminal investigators). All special agents at ATF are GS–1811s.

2. Pursuant to 5 C.F.R. §§ 6.1, 6.2, OPM has authorized ATF to hire a limited number of Special Agents under Schedule A. Schedule A positions are "[p]ositions other than those of a confidential or policy-determining character for which it is not practicable to examine." 5 C.F.R. § 6.2. Individuals hired under Schedule A do not have the same civil services protections as those hired on a career-conditional basis. Although OPM has authorized ATF to hire 100 individuals under Schedule A, ATF currently has only three (3) Schedule A Special Agents. *See* Defendant's Memorandum of Points and Authorities in Response to Objections and In Support of Final Court Approval of the Settlement. ("Def.Resp.")

ATF's Law Enforcement Career Development Plan. Information concerning the hiring of this expert, its impact on ATF's personnel systems, and the fact of the pendency of the mediation was disseminated by the Director of ATF to all employees throughout the agency by two teletypes.

4. Intensive settlement negotiations, through the mediation process, followed. The mediation included the participation of then-Undersecretary of the Treasury, Ronald Noble, other senior Treasury officials, the Director of ATF, defense counsel, Plaintiffs' counsel and class representatives. The parties, after numerous face-to-face meetings and teleconferences, substantial drafting, and intense negotiations for over one and one-half years, reached a proposed Settlement Agreement, which was submitted to the Court for preliminary review and approval.

5. By Order filed July 9, 1996, the Court granted preliminary approval of the parties' Settlement Agreement. Pursuant to that Order, ATF took steps designed to notify all class member and all current ATF Special Agents of the Settlement Agreement, the Court's Fairness Hearing and the deadline for filing objections. *See* Def.Resp. at Exhibit 1.

6. The Settlement Agreement resolves all of Plaintiffs' claims, including attorneys' fees and costs. The Settlement Agreement provides individual monetary payments, sets forth a procedure for providing individualized non-monetary equitable relief, provides for the development of a new promotion assessment system, and provides for additional equitable relief in the areas of performance appraisals, training, transfers, awards, bonuses, discipline, and assignments to special teams. The essential features of the agreement as summarized by Defendant are as follows:

A. A total of $4.7 million will be awarded to the class as a whole, which may be awardable to each individual as determined according to two formulas. One formula is designed to provide the plaintiffs compensation for, among other things, backpay and front pay. Accordingly, $675,000 of the $4.7 million will be placed by plaintiffs' counsel into a fund ("The Backpay Fund") to satisfy those claims. The second formula is designed to take into account, among other things, claims for compensatory damages based upon emotional distress, mental anguish, and pain and suffering. The remaining $4.025 million of the $4.7 million accordingly will be placed by plaintiffs' counsel into a "Compensatory Damages Fund." *See* Settlement Agreement, at 7–9; Appendices B, C, G, H.

B. Plaintiffs will receive reimbursement of $1.2 million in documented attorneys' fees and expenses. In addition, plaintiffs will receive up to a maximum total of $150,000 for reasonable attorneys' fees plus expenses and costs incurred after Entry of Judgment in the District Court until the expiration of the Settlement Agreement. *See* Settlement Agreement, at 37–38, Appendix D.

C. The Settlement Agreement also provides a mechanism for granting individualized, non-monetary relief to plaintiffs. Any member of the plaintiff class who has a claim not yet resolved or dismissed between December 25, 1981 and the Entry of Judgment in the District Court on grounds of discrimination on the basis of race in promotions, discipline, awards, assignments (including undercover assignments), details, terminations, performance evaluations, or training may submit a claim under the procedures set forth in the Settlement Agreement. No monetary relief may be granted under this procedure, which has elaborate safeguards, including the participation of a Recommending Official that is selected by mutual agreement of the parties. The Director of ATF is the final decision-maker on these claims, which are not further reviewable by any court or any other quasi-judicial or administrative body. *See* Settlement Agreement, at 9–14, Appendix G.

D. ATF will retain a qualified individual approved by the plaintiffs (currently, Dr. Irwin Goldstein) to assist the agency in writing a work statement to be used in connection with the procurement of a new promotion assessment system. That system will be developed in accordance with the Uniform Guidelines issued by the U.S.

Equal Employment Opportunity Commission, codified at 29 C.F.R. Part 1607, or other professional standards, and any applicable federal laws and regulations and shall, *inter alia,* minimize adverse impact on African–Americans who are GS–1811 series Special Agents employed by ATF. *See* Settlement Agreement, at 20–25.

The Request For Proposals ("RFP")/solicitation will be designed to select a contractor to develop a promotion assessment system to replace the existing Career Development Plan for the Office of Criminal Enforcement. The contract would also provide for a job analysis that would not only provide the basis for developing the new promotion assessment center, but it would provide the basis for developing other equitable relief in the areas of performance appraisals, training, transfers, awards and bonuses, and assignment to special teams. *See* Settlement Agreement, at 20–25, 27–33.

E. ATF would convert to career conditional status all Special Agents who, on the Effective Date of this Settlement Agreement, are qualified for such conversion and are still in Schedule A status. *See* Settlement Agreement, at 18–19. Currently, there are three Special Agents remaining in Schedule A status.

F. Plaintiffs' counsel will be provided with information sufficient to monitor whether ATF is complying with the terms of the Settlement Agreement. To assist the parties in monitoring compliance, ATF will establish and maintain a computerized database containing relevant statistical data. An expert mutually acceptable to the parties will produce a report that analyzes the employment data to determine whether the employment practices or personnel systems at issue have had an adverse impact upon African–American Special Agents in the GS–1811 series during the previous data gathering period as well as cumulatively from the Entry of Judgment in the District Court. *See* Settlement Agreement, at 14–18.

Def.Resp. at 3–6.

7. There has been overwhelming class support for the proposed settlement. There are approximately 245 members of the class. Yet, only one class member, Special Agent Davenport, has objected to the Settlement Agreement. Special Agent Davenport seeks to "opt out" of the Settlement Agreement and argues that class certification is inappropriate. The Settlement Agreement, however, states:

> No class member may opt-out of this Settlement Agreement, but any class members may elect not to accept the relief or any portion of the relief, provided under this Settlement Agreement. So doing, will not, however, revive or preserve any individual rights on the part of that class member.

Settlement Agreement, at 6–7.

8. The remaining objections to the Settlement Agreement were filed by non-class members. There are 386 total objections from non-class members. All but 20 of these objections are made through a form ("form objections") with no material distinction among them.[3]

9. The Court conducted its Fairness Hearing on September 12, 1996. The ATF Hispanic Association (the "Association") has objected to the Settlement Agreement and appeared, through counsel, at the Fairness Hearing. The Association's main concern as articulated in oral argument is that the Settlement Agreement does not address alleged discrimination against its members.

B. *Findings As To Intervention*

10. Vincent C. Noble, Leonor Magaletta, Michael S. Russell, Richard Issa, Frank Na-

---

**3.** Although some of the objections were not timely filed, the parties nevertheless briefed all objections filed by September 9, 1996 and, accordingly, the Court will address all such objections as well. The great majority of the 366 "form objectors" simply signed the form objection. Fifty-five objectors out of these 366 form objectors, however, made minor, immaterial revisions to the form objection. Most of these minor changes are to the second paragraph to the form objection—many objectors changed the language to indicate that only "some" African–American Special Agents have suffered discrimination, or that "all special agents" (rather than just African–Americans) have suffered discrimination. Some objectors have deleted the paragraph altogether, or have made other minor, immaterial changes to the forms.

poli and James L. Jorgenson, individually, and the National Association of Treasury Agents ("NATA") (collectively, the "Putative Intervenors"), appeared through counsel at the Court's Fairness Hearing. The Putative Intervenors moved to intervene in this action on August 28, 1996.

11. The Putative Intervenors knew of the existence of this lawsuit for "some time." Putative Intervenors' Proposed Complaint ¶ 6. The fact of the filing of Plaintiffs' Complaint in November 1990 and the details of the Complaint were reported widely in the press. *See* Exhibit A to Plaintiffs' Opposition to the Motion to Intervene.

12. Intervenor NATA, from at least 1990 through 1995, regularly published and disseminated throughout its membership a newsletter known as *"The Agent."* *The Agent* was routinely circulated to ATF Special Agents, including the Putative Intervenors. The fact that this lawsuit has been filed was reported in *The Agent,* was thereafter periodically updated in following issues of *The Agent,* and was the subject of editorials and letters from unnamed ATF Special Agents. *See* Exhibit B to Plaintiffs' Opposition to the Motion to Intervene.

13. As with the initial Complaint, the fact of the filing of the Amended Complaint was widely reported in the media, and particularly in a front-page article in *The Washington Post. See* Exhibit C to Plaintiffs' Opposition to the Motion to Intervene. Copies of the Amended Complaint were circulated extensively throughout ATF. The Putative Intervenors, however, did not seek to intervene in this lawsuit until now, even in the face of the broad relief sought in the Amended Complaint.

14. Following the parties' extensive discovery and Plaintiffs' filing of the class certification motion, the issues concerning this lawsuit were again widely publicized in the press. *See* Exhibit D to Plaintiffs' Opposition to the Motion to Intervene. Defendant opposed the class certification motion with extensive briefing and expert statistical reports. The Putative Intervenors, however, still did nothing with respect to this lawsuit.

15. Although, as is the practice in this Court's ADR Program, the content of the mediation was confidential, the Putative Intervenors were aware of the fact of the mediation and were aware that it was being conducted in confidence. Nevertheless, the Putative Intervenors did not seek to become a party and gain access to the mediation.

16. Early in the mediation, ATF decided to hire a mutually-acceptable outside expert to assist the Agency to revise ATF''s Law Enforcement Career Development Plan. Information regarding the hiring of this expert, and its impact on the class settlement, was sent, on October 11, 1994, by the Director of ATF over a teletype to the entire agency. The teletype specifically referencing the settlement negotiations in the African American Special Agents' class action. The teletype advised ATF employees as follows:

AS A RESULT OF THE MEDIATION CURRENTLY TAKING PLACE BETWEEN THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS AND THE AFRICAN–AMERICAN SPECIAL AGENTS, ATF HAS AGREED TO RETAIN AN OUTSIDE EXPERT TO ASSIST THE AGENCY IN DESIGNING A NEW CAREER DEVELOPMENT PLAN AND PERFORMANCE APPRAISAL SYSTEM THAT HAS THE LEAST POSSIBLE ADVERSE IMPACT ON ANY GROUP OF EMPLOYEES.

Exhibit C to Plaintiffs' Opposition to the Motion to Intervene.

17. To ensure that all ATF employees received his first teletype, several weeks later the Director of the ATF distributed yet a second copy:

THE ATTACHED TELECOMMUNICATIONS MESSAGE (ORIGINALLY TRANSMITTED ON 10/11/94) IS BEING RETRANSMITTED TO ENSURE THAT EVERY EMPLOYEE RECEIVES A COPY OF THIS MESSAGE.

*Id.*

18. During this time, and after the circulation of the teletypes referred to above, *The Agent,* the newsletter of NATA, published a report concerning the status of the African–American Class Action mediation and stated

that it was monitoring the situation "very carefully":

### Black Class Action Scores Victory for All?

Washington—The Bureau of Alcohol, Tobacco, and Firearms announced this week that pursuant to negotiations with representatives of the agents who filed a Black Class Action complaint, ATF has agreed to hire an outside consultant. This consultant will assist ATF officials in the development of a career plan and performance appraisal system which would have no disparate impact on any group of employees. NATA Notes ... NATA will be monitoring this situation very carefully. While we are extremely wary of plans which propose to ensure "group" rights, it is possible that if properly written and evenly administered, the proposed plans may ensure fairness and equity for ALL ATF agents rather than just a vocal minority.

*The Agent,* December 1994. *See* Exhibit B to Plaintiffs' Opposition to Motion to Intervene (emphasis in original). As of late 1994, however, the Putative Intervenors did not move to intervene.

19. In August of 1995, mediation intensified with participation of then-Undersecretary of Treasury Ronald Noble, along with other ATF and Treasury officials. Also in the summer of 1995, news broke of the "good old boys roundup" that had been conducted on an annual basis since approximately 1980. This "roundup" was widely-reported in the press. *See* Exhibit F to Plaintiffs' Opposition to the Motion to Intervene. Many of these news articles discussed the pending African–American class action.

20. During this time period, *The Agent* also discussed the progress of the African–American Class Action and called for members to support litigation on behalf of NATA itself. *See* Exhibit B to Plaintiffs' Opposition to the Motion to Intervene. Moreover, in October of 1995, Intervenor Jorgenson wrote a letter to NATA's members on behalf of Intervenor NATA stating:

Within the past few weeks, the National Association of Treasury Agents (NATA) has received numerous inquiries from concerned ATF special agents. The focus of these inquiries has been two-fold. First, many agents have heard rumors of an agreement to settle the lawsuit pending between ATF and Afro–American ATF agents. While no official settlement terms have been announced, those contacting NATA have been very upset with what they've heard thus far. The second area of inquiry to NATA pertains, once again, to the rumored massive transfers of senior ATF agents. While no official announcements have been made from ATF, it doesn't take a brain surgeon to realize that, if true, such transfers would impact disparately on white male agents and supervisors over the age of 40.

In response to these inquiries, NATA has agreed to serve as an initial administrator for a class action lawsuit for ATF agents concerned about the black agents settlement as well as for ATF agents worried about future transfers. These are two separate actions. They are open ONLY to active duty ATF agents.

Enclosed are two flyers. One pertains to the black agents' settlement while the other concerns that transfer of ATF agents. Please duplicate these flyers as needed and distribute in a variety of ways to active duty ATF agents in your area. If you are aware of ATF agents outside of your area, please ensure that they too, receive a copy. If sufficient response is not received from active duty ATF agents, no future action will be taken. Frankly, we can't afford it! If there are any questions, call NATA at (202) 828–1960. Your assistance is appreciated.

Exhibit C to Plaintiffs' Opposition to the Motion to Intervene.

21. Despite Intervenor NATA's solicitations, in 1995, to finance a lawsuit to challenge the perceived settlement, the Putative Intervenors did not file any such lawsuit and did not move to intervene in this lawsuit.

22. The parties continued to mediate and, eventually, exchanged draft settlement agreements. The Settlement Agreement went through over 15 iterations, involving intensive negotiations on a face-to-face basis, sometimes on a daily basis, over a myriad of

details. Negotiations on the text of the Settlement Agreement lasted from August 1995 through April 1996.

23. The final proposed Settlement Agreement, reached in April 1996, was reviewed and approved by senior DOJ, ATF, and Department of the Treasury officials.

24. The fifteen named plaintiffs unanimously approved the Settlement Agreement, as well.

25. After all these reviews were completed, the Settlement Agreement was submitted to the Court for preliminary review and approval. On July 9, 1996, the Court preliminarily approved the Settlement Agreement, ordered any objections from any interested party filed by August 28, 1996, and set a Fairness Hearing for September 12, 1996.

26. Shortly thereafter, ATF took steps designed to notify every Special Agent in the Bureau of the terms and conditions of the settlement, and provide a copy of the Settlement Agreement to each ATF Special Agent. *See* Def's.Resp. at Exhibit 1.

27. On the last day for filing objections to the Settlement Agreement—August 28, 1996—the Putative Intervenors filed their Motion to Intervene. The Motion, as filed, lacked any pleading as required by Fed. R.Civ.P. 24. The defect was cured on September 6, 1996, six days before the Fairness Hearing when the Putative Intervenors submitted a proposed Complaint in Intervention. On that same day, September 6, Plaintiffs filed their Opposition to the Motion to Intervene, which was joined by Defendant on September 9, 1996. On September 11, 1996, the day before the Fairness Hearing, Putative Intervenors filed a Reply which contained, for the first time, factual assertions in support of intervention. These "factual assertions," however, were in the form of unsigned Declarations of some of the Putative Intervenors, with conclusory allegations concerning the Putative Intervenors' interests. The purported declarants did not seek to speak at the Fairness Hearing or submit any testimony, written or otherwise, under oath.

## II. CONCLUSIONS OF LAW

### A. *Class Certification*

#### 1. *Standard of Review Under Rule 23*

■ 28. Fed.R.Civ.P. 23(e) imposes a duty on the district courts to review and approve all class action settlements. It is well established that in executing this fiduciary obligation to the class, the Court must decide at the conclusion of the Fairness Hearing whether the settlement is fair, reasonable, and adequate. *See Luevano v. Campbell,* 93 F.R.D. 68, 85 (D.D.C.1981); *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983). The factors a court should consider before approving a settlement agreement include "the fairness of the decree to those affected, the adequacy of the settlement to the class, and the public interest." *Williams,* 720 F.2d at 921.

29. There is a strong public policy in favor of the settlement of litigation, and "[d]ecisions emphasizing the preferred role of settlements under Title VII are legion." *Luevano,* 93 F.R.D. at 85 (citing cases). As the Supreme Court has recognized, this policy is particularly important in the resolution of cases brought under Title VII of the Civil Rights Act of 1964 because of the "strong preference" of Congress for "encouraging voluntary settlement of employment discrimination claims." *Carson v. American Brands,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). In *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017–18, 39 L.Ed.2d 147 (1974), the Supreme Court explained that "Congress enacted Title VII ... to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin.... Cooperation and voluntary compliance were selected as the preferred means for achieving this goal." 415 U.S. at 44, 94 S.Ct. at 1017, (quoted in *Carson v. American Brands, Inc.,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14.)

■ 30. Accordingly, "voluntary compromises of Title VII actions enjoy a presumption of validity, and should therefore be approved 'unless ... [they] contain provisions that are unreasonable, unlawful, or against

public policy.'" *Kirkland v. New York State Dep't of Correctional Services,* 711 F.2d 1117, 1128–29 (2d Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984) (citations omitted).

31. A court should not withhold approval simply because the benefits accrued from a settlement agreement are not what a successful plaintiff might receive in a fully-litigated case. *See United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977). A settlement is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed.[4] *Moore v. City of San Jose,* 615 F.2d 1265, 1271 (9th Cir.1980); *Luevano,* 93 F.R.D. at 86. Class counsel and the class representatives may compromise their demand for relief in order to obtain substantial and assured relief for the class. A court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof. *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir. 1975); *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Moreover, it must be emphasized that although a settlement agreement does not provide complete satisfaction to all those it affects, this, in and of itself, is not enough to render it "unreasonable". *EEOC v. New York Times,* 1995 WL 135577 at *4 (S.D.N.Y.1995). "Unless this were the case, only in the most rare instances would a Title VII case be settled by proposed compromises which in turn would frustrate Congress's expressed preference for achieving Title VII compliance by voluntary means." *Id.*

32. Courts have approved settlements to which a significantly greater percentage of the class objected than is the case here. *See, e.g., Reed v. General Motors Corp.,* 703 F.2d 170, 174 (5th Cir.1983) (forty percent); *Cotton v. Hinton,* 559 F.2d at 1333 (fifty percent); *Bryan v. Pittsburgh Plate Glass Co.,*

494 F.2d 799, 803 (3rd Cir.1974) (twenty percent), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Boyd v. Bechtel Corp.,* 485 F.Supp. 610, 624 (N.D.Cal.1979) (sixteen percent); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20 (2d Cir.1987) (thirty six percent); *see also Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) ("a settlement may be approved over a significant percentage of objections from class members" (citation omitted)). Although the Court should not ignore the existence of objections in assessing the fairness, adequacy, and reasonableness of the Settlement Agreement, the existence or absence of objections is not *per se* controlling. Indeed, it has long been recognized that " '[t]he Court [should not] make the proponents of the agreement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *EEOC v. New York Times,* 1995 WL 135577 at *4 (quoting *Milstein v. Werner,* 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)).

33. A court reviewing a class settlement should also consider whether the proposed agreement is consistent with the public interest. *See United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981); *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1014 (7th Cir.1980). A settlement agreement which seeks to enforce a statute must be consistent with the public objectives sought to be attained by Congress. *See Patterson v. Newspaper & Mail Deliverers' Union,* 514 F.2d 767, 771 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Such voluntary compliance through settlement will frequently contribute to the ultimate achievement of the public objectives. Settlement agreements minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies

---

4. Given the nature of class action litigation in general, and even if there were an adjudication of liability against ATF, fashioning injunctive relief and determining individual monetary relief is a lengthy, time consuming, and an uncertain process. Indeed, if each of the claimants were to have individual hearings under *International*

*Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), it could easily take several years before the remedial phase of the litigation was completed. *See, e.g., Berger v. Iron Workers,* 1994 WL 151292 (D.D.C. 1994).

adjudication of both liability and remedies. *See Village of Arlington Heights,* 616 F.2d at 1014. Moreover, there is a strong public interest in settling this dispute so that this important agency is not required to direct resources to litigation as opposed to its law enforcement mission.

### 2. *Class Certification Is Proper Under Rule 23(b)(2)*

#### a. *Plaintiffs Have Satisfied Rule 23(a)*

■ 34. Plaintiffs seek to certify a class under Fed.R.Civ.P. 23(b)(2) of "all African–American individuals who were ATF Special Agents in the GS–1811 Series at any time between December 25, 1983 and the Entry of Judgment in the District Court." Settlement Agreement at 3.

35. Rule 23(a) of the Federal Rules of Civil Procedure provides that individuals may bring suit as representative parties on behalf of members of a class if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *see also General Telephone Company v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982). The sole objecting class member, Special Agent Davenport, argues that an across-the-board class is not properly certifiable here under *Falcon.* The Court disagrees.

36. The Court finds that the Plaintiffs have satisfied all of the requirements of Fed. R.Civ.P. 23(a). First, Plaintiffs have satisfied the numerosity requirement of Rule 23(a). The approximately 245 class members are dispersed throughout the United States, making joinder of all of them impracticable. *See* Exhibit A to Settlement Agreement.

37. Plaintiffs have demonstrated to the satisfaction of the Court that there are questions of law and fact common to the class members. All of the allegations in this case arise from the Defendant's alleged discriminatory employment policies and practices which allegedly rely upon excessive subjec-

tivity in the employment-related decision-making process. These alleged discriminatory systems apply nationwide to all class members. Because the allegations arise from the same general alleged discriminatory policy, and manifest themselves in ways that have allegedly class-wide discriminatory effects, the entire class of African–American Special Agents is bound together by a common legal and factual thread.

■ 38. For these reasons as well, the claims of the representatives of the class are typical of the claims of the class as a whole. A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory." *EEOC v. Printing Industry,* 92 F.R.D. 51, 54 (D.D.C. 1981) (citing 1 Newberg, *Class Actions,* § 1115f at 191 (1977)). Although this is an across-the-board class (except as to hiring), at least one named plaintiff has a claim relating to each challenged practice for which relief is provided. Accordingly, the concerns of *Falcon* relating to the propriety of the across-the-board class are not implicated here. Thus, the Court finds that the claims of each class member present similar questions of fact and law arising out of the same alleged discrimination in the agency.

39. In addition, the Court finds that the named Plaintiffs fairly and adequately have protected and will protect the interests of the class. Indeed, only one class member, out of approximately 245, objects to the Settlement Agreement. Nothing in the record indicates that the named Plaintiffs have conflicting interests with those of other class members. *See Richardson v. Coopers & Lybrand,* 82 F.R.D. 335 (D.D.C.1978). It is also clear from the representations of counsel and the evidence before the Court that the named plaintiffs were involved in the negotiation of the Settlement Agreement and had regular communications with the class since the filing of this litigation.

40. Finally, the Court finds that, based upon the submissions of counsel and the Court's observation of the conduct of this litigation, class counsel have appropriately represented the interests of the class. Plain-

tiffs' counsel are qualified, experienced and able to represent the class, and no one has challenged the adequacy of class counsel. The Court therefore finds that the requirements of Rule 23(a) have been met.

b. *Rule 23(b)(2) is the Proper Method of Certification In This Case and No Opt–Out Rights Are Necessary*

41. Rule 23(b)(2) is appropriate when the party opposing the class allegedly has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Notes to Rule 23 explicitly state that "cases in the civil-rights field" are "illustrative" of the class actions meant to be certified under Rule 23(b)(2). *See* Advisory Committee Notes to 1966 Amendments to Rule 23(b)(2).

■ 42. Special Agent Davenport, a female African–American Special Agent, objects to the settlement on the grounds that she believes her individual case is unique and does not fit into the class allegations or the class-wide relief. Moreover, she seeks to "opt-out" of the class, arguing that certification under Rule 23(b)(2) is improper in this case.

43. Special Agent Davenport has filed an administrative EEO complaint against ATF, which she has attached to her objection. Special Agent Davenport alleges that ATF has discriminated against her on the basis of race and sex. She also is a named defendant in an action brought against ATF by Putative Intervenor Special Agent Vincent Noble, although Special Agent Davenport's counsel represented that DOJ assumed the defense of that action on her behalf, having concluded that any alleged wrongful acts were in the course and scope of her employment, and represented that the action has recently been dismissed against Special Agent Davenport.

44. Special Agent Davenport first suggests that she is not a part of the class because of the nature of her race claims. She describes her claim as "discrimination ari[sing] from the racist conduct of a coworker and the BATF's repeated failure to take corrective action." Davenport Obj., at 3. Davenport, however, is a GS–1811 series Special Agent and is African–American. Moreover, the Settlement Agreement addresses all discrimination in employment claims, including discrimination on the basis of race in promotions, discipline, awards, assignments (including undercover assignments), details, Schedule A hiring, hostile work environment, terminations, performance evaluations, training assignments, and retaliation against them for their equal employment opportunity (EEO) activities.[5] If Davenport's claim is a hostile work environment claim based upon her race, it certainly is encompassed within this Settlement Agreement, to the extent it has been properly preserved.[6]

45. Davenport also suggests that she is not a part of the class because she has gender claims and perhaps claims under the Freedom of Information Act, 5 U.S.C. § 552. *See* Davenport Obj., at 3, 11. These potential claims, which are not race claims or retaliation claims based upon race, certainly would not be precluded by the Settlement Agreement. Moreover, Davenport certainly is not precluded from *defending* her interests in the libel action that has been filed against her by a co-worker, *see* Davenport Obj., at 3, but which apparently has now been dismissed. Accordingly, none of these arguments provides a valid basis for objecting to the Settlement Agreement.

(i) *No Opt–Out Is Required to Protect SA Davenport's Rights*

■ 46. There is no absolute right to opt-out of Fed.R.Civ.P. 23(b)(2) class actions. *Laskey v. UAW*, 638 F.2d 954, 956 (6th Cir.

---

**5.** The Settlement Agreement excludes potential claims from individuals who have not been hired by ATF for any reason whatsoever. *See* Settlement Agreement, at 3. Davenport, who is an ATF employee, certainly does not have such a claim.

**6.** Davenport indicates, however, that her claims have been dismissed by ATF. She has not provided sufficient information to make a determination that her claims are properly preserved nor is such a ruling necessary here.

1981); *King v. South Cent. Bell Tel. & Tel.*, 790 F.2d 524, 530 (6th Cir.1986) (plaintiff "could not opt out because the action did not include that privilege"). In the absence of agreement by the parties, a class member is not allowed to opt out of a class action brought under Rule 23(b)(2). *See Luevano v. Campbell*, 93 F.R.D. at 85–86. So-called mandatory classes satisfying Rule 23(b)(1) or (2) were designed specifically to avoid the risks of inconsistency, prejudice, or inequity that would result to persons similarly situated in the absence of a unitary adjudication of their common claims. Thus, the protection of the rights of class members in non-opt-out classes is much more interdependent with the resolution of the rights of others similarly situated than is the case for Rule 23(b)(3) class members. *See White v. National Football League*, 822 F.Supp. 1389 (D.Minn.1993), *aff'd on other grounds*, 41 F.3d 402 (8th Cir.) *cert. den.*, —— U.S. ——, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1994); 1 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 1.20, at 1–48 (3d ed.1992); *Note,* "The Class Action Dilemma: The Certification of Classes Seeking Equitable Relief and Monetary Damages After *Ticor Title Insurance Co. v. Brown,*" 63 Fordham L.Rev. 1745, 1770–71 (1995) ("*Note, Ticor*").

47. Special Agent Davenport argues that she has a right to opt-out of the Settlement Agreement based upon *dicta* in the Supreme Court's decision in *Ticor Title Insurance Co. v. Brown*, 511 U.S. 117, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994). In *Ticor,* the Court noted in its *per curiam* decision that there was a "substantial possibility" that actions seeking monetary damages or perhaps primarily monetary damages can only be certified under Rule 23(b)(3), *id.* at 118–19, 114 S.Ct. at 1360–61, but declined to address the constitutional issue, with three members dissenting.

48. Nothing in *Ticor* precludes final approval of the Settlement Agreement. *First,* the referenced language in *Ticor* is *dicta* and merely raises a question; it does not decide an issue. *Second,* the *Ticor* opinion is not a decision on the merits, but a dismissal of a writ as improvidently granted. It is clear that a denial of a writ of *certiorari* "imports

no expression upon the merits of the case, as the bar has been told many times." *United States v. Carver,* 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923). *Accord Maryland v. Baltimore Radio Show,* 338 U.S. 912, 917–18, 70 S.Ct. 252, 254–55, 94 L.Ed. 562 (1950). The fact that the Supreme Court has decided not to decide whether a class action seeking monetary damages must be certified under Rule 23(b)(3) is of no precedential value.

49. Davenport also relies heavily on the District Court's decision in *Celestine v. Citgo Petroleum Corp.*, 165 F.R.D. 463 (W.D.La. 1995), which held that no class certification was appropriate in Title VII cases because of the new provisions of the Civil Rights Act of 1991, which allowed for trial by jury of individualized monetary awards. For the reasons set forth below, the Court rejects Davenport's arguments. As an initial matter, the case did not involve the approval of a Settlement Agreement at all. Moreover, the extreme position of the court in *Celestine* has been rejected by other courts that have considered the same issue because of the need for uniformity and judicial efficiency. *See Griffin v. Home Depot, Inc.,* 168 F.R.D. 187 (BNA) (E.D.La.1996); *Butler v. Home Depot, Inc.,* 1996 WL 421436, 70 F.E.P. Cas. (BNA) 51 (N.D.Cal.1996); *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439 (N.D.Cal.1994); *see also Note, Ticor, supra* (discussing *Ticor* and arguing that (b)(2) classes continue to be appropriate for certification even if monetary damages are sought).

50. Even if the Court were to follow the approach of *Celestine,* the facts of this case would lead to a quite different result. In *Celestine,* plaintiffs sought to certify a class of 1,000 African–American employees and applicants in a variety of facilities in which the opportunities for advancement were determined by the particular circumstances surrounding his or her employment. 165 F.R.D. at 470. The class to be certified included applicants as well as employees at two separate plant facilities, belonging to six different unions, all with different requirements for admission and advancement. *Id.* at 467. Thus, the *Celestine* court found that the class action device was not manageable

or efficient in handing the over 1,000 individualized jury trials that would be required there. Although this Court does not believe those concerns prevent class certification in employment discrimination cases, the manageability problems referenced by the court in *Celestine* are not present in the instant case. *First,* the plaintiffs in the case at hand all work in the same job classification—GS–1811 series Special Agents. They are all subjected to the same promotional system, the same performance evaluation system, the same disciplinary system, as well as the same uniform and centralized hiring and employment procedures. *Second,* because of the mediated settlement, the posture of this case is much different than that of *Celestine* or any of the other cases referenced above requiring bifurcation, such as *Butler.* In all of the referenced cases, the court's decision was forward-looking—the ultimate outcome of litigation and the procedures that would be necessary to resolve the various individualized claims were yet unknown. In the case at hand, the relief that the class will receive has been negotiated between the parties. The Settlement Agreement creates procedures in which the individualized claims are managed and handled efficiently through claims procedures administered by class counsel. The manageability and efficiency of a class action settlement is quite different than that in a litigated case.

51. The only interest that counsel for Special Agent Davenport articulated at oral argument supporting her right to opt-out was the desire to have this case litigated in Kentucky as opposed to Washington, D.C. Her right to a change of venue does not rise to the level of a constitutionally protected interest. The prejudice, if any, Special Agent Davenport would suffer by being bound to this settlement is far out-weighed by the substantial benefits to the class as a whole under the Settlement Agreement. Special Agent Davenport did not assert that class counsel had not protected or would not adequately protect her rights with respect to this Settlement Agreement, nor did she assert that there would be any greater relief available to her by litigating this case in Kentucky as opposed to participating in the class action settlement. To the contrary,

Special Agent Davenport will be entitled to seek backpay and up to $300,000 from the Compensatory Damages Fund, as well as utilize the equitable procedures set forth in the Settlement Agreement, with no diminution of her right to pursue her gender and/or FOIA claims, assuming that she has preserved such claims.

52. Special Agent Davenport does not challenge the fairness or adequacy of class counsel in the administration of the agreement. Even if she had, however, the Settlement Agreement provides that all tentative decisions of class counsel on the backpay compensatory damages are appealable to a neutral official chosen by the class. It is unnecessary to decide the constitutional question theoretically posed by Special Agent Davenport because the procedures set forth under the Settlement Agreement give her full relief and due process with respect to her claims of racial discrimination.

53. Indeed, in cases where sufficient alternative procedural safeguards are employed, opt-out rights are not required to satisfy notions of fundamental fairness or due process. *See, e.g., Williams v. Burlington Northern, Inc.,* 832 F.2d 100, 104 (7th Cir. 1987) (even though plaintiff did not have right to opt out, court "provided [plaintiff] with the equivalent due process protection that would be accorded to a Rule (23)(b)(3) class member"), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *National Football League,* 822 F.Supp. at 1411–12.

54. Even though Special Agent Davenport may not opt out, the requirements of due process and fundamental fairness have been satisfied because the objector has been: (1) adequately represented by the named Plaintiffs; (2) adequately represented by capable and experienced class counsel; (3) provided with adequate notice of the proposed settlement; (4) given an opportunity to object to the settlement; and (5) assured that the settlement will not be approved unless the Court, after analyzing the facts and law of the case and considering all objections to the proposed settlement, determines it to be fair, reasonable and adequate. Indeed, Spe-

cial Agent Davenport does not dispute any of these elements.

### (ii) *Equitable Relief Predominates*

55. The Advisory Committee Notes explain that class certification under Rule 23(b)(2), in a case in which monetary relief is sought, may be impermissible if "the appropriate final relief relates *exclusively or predominately to money damages."* *Notes,* 39 F.R.D. at 102 (emphasis added). In the present action, the predominately *equitable* claims of the class members arose from a system of personnel actions that have been uniformly imposed on all class members.

56. Special Agent Davenport argues, however, that this class cannot be certified pursuant to Rule 23(b)(2) because she claims monetary damages are the predominate type of relief. Her argument is belied by the Settlement Agreement itself. Although the compensatory damage award is substantial, $4,025,000, it constitutes an average of less than $16,500 for each member of the class, and no class member is guaranteed any award from the Backpay or Compensatory Damage Funds unless he or she provides evidence of discrimination and resulting damage. Weighed against the possible receipt of $16,500 is each class member's right to participate in the individualized equitable relief procedure, receive promotions, reinstatement, new or adjusted performance evaluations, adjusted personnel records, including awards, lateral changes of assignments, correction or removal of disciplinary action, and a host of other equitable measures. Any one of these equitable remedies could be worth more than $16,500 to a Special Agent for the life of his or her career. Cumulatively, they can make or break a Special Agent's career.

57. The class members' claims in this case also are interrelated because they were subject to the same processes for such things as competitive promotions. Accordingly, there is a significant identity of interest between class members for purposes of analyzing their economic injuries. *Cf. National Football League,* 822 F.Supp. at 1411. To provide a meaningful class remedy, any injuries must be redressed primarily through broad injunctive relief. In the absence of such relief, any award of monetary damages would merely be a stopgap measure, insufficient to prevent the reoccurrence of such injuries while likely generating an unending procession of lawsuits.

58. Pursuant to the Settlement Agreement, the class as a whole will receive substantial class-wide equitable relief. ATF is required to retain contractors to prepare job analyses, and redesign its entire promotion assessment system. It will also revise its procedures for performance appraisals, training procedures, discipline procedures, awards, bonus and assignments to special teams. It will make changes in the use of Schedule A in hiring and undertake more centralized approval of new agent hiring. ATF is also required to collect data for three (3) years after the implementation of the new promotion assessment system and that data will be used to determine whether the employment practices or personnel systems have an adverse impact. These far-reaching equitable measures—which have substantial value to the class as a whole and to the class members individually—far outweigh the $16,-500 average compensatory damage award. Thus, the Settlement Agreement as a whole is predominantly equitable in nature.

59. In sum, this Settlement Agreement is properly a (b)(2) settlement both by agreement of the parties and by law. The policy in favor of not allowing class members to opt out of Rule 23(b)(2) class actions stems from the concern that "defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately." *Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 507 (5th Cir.1981). Thus, "[l]awsuits alleging class-wide discrimination are particularly well suited for Rule 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy." *Senter v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). "In the interests of judicial economy and efficiency," *i.e.,* to avoid needless duplicative suits, courts should gen-

erally certify classes pursuant to Rule 23(b)(2) when the class members are seeking injunctive relief and, correspondingly, not allow class members to opt out. *Laskey,* 638 F.2d at 956.

## B. *The Settlement Is Fair Under Section 108 of the Civil Rights Act*

### 1. *Standard of Review*

 60. The parties also seek to have this Court approve the Settlement Agreement pursuant to Section 108 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(n). If so approved, the Court's order in this case would bar future challenges to the procedures and practices set forth in the Settlement Agreement. Section 108 requires that, in order to invoke this procedure, the Court must find that the Defendant has given:

(I) Actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely effect the interest and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

(II) A reasonable opportunity to present objections to such judgment or order.

*Id.*

61. As set forth in Exhibit 1 to Defendant's Response, Defendant undertook steps to provide actual notice of the Fairness Hearing and Settlement Agreement to all Special Agents of ATF (class members *and* non-class members), and to ensure that all current Special Agents signed a receipt for a full copy of the Settlement Agreement, a summary of its provisions, as well as communications from the Director of ATF explaining the need to enter into the settlement.

62. This notice, under all of the circumstances, was sufficient to apprise interested parties of the proposed settlement and afford them an opportunity to comment on the terms of the Settlement Agreement at the Fairness Hearing. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 70–71 (2d Cir.1982) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see also Grunin v. International House of Pancakes,* 513 F.2d 114, 121–22 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1983). The Settlement Agreement and Fairness Hearing Notice delivered to class members and non-class members reasonably conveyed the information that was required to be communicated and afforded a reasonable time for those interested to comment on the proposed settlement. Thus, proper notice was given to the class of the proposed settlement in accordance with Rule 23, section 108, and due process requirements.

63. On September 12, 1996, this Court held a Fairness Hearing at which time any person who filed written objections to the Settlement Agreement was given an opportunity to address their objections. Indeed, a substantial number of non-class members filed written objections to the Settlement Agreement, as discussed and resolved below. Accordingly, the Court finds that the Defendant has complied with the procedures of Section 108 of the Civil Rights Act of 1991.

### 2. *Standard of Reviewing the Objections to the Settlement Agreement*

 64. Title VII of the Civil Rights Act of 1964, as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e–2, 2000e–3. The statute "provides the exclusive judicial remedy for claims of discrimination in federal employment," *Brown v. General Services Administration,* 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976), and "precludes actions [alleging employment discrimination] against federal officials for alleged constitutional violations as well as actions under other federal legislation." *Kizas v. Webster,* 707 F.2d 524, 542 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

 65. The standard for determining whether affirmative relief is justified under Title VII is less stringent than under the Constitution. Under Title VII, a "manifest imbalance" in a "traditionally segregated job

category" will justify the adoption of race-conscious relief. *Johnson v. Transportation Agency, Santa Clara County, California,* 480 U.S. 616, 630, 107 S.Ct. 1442, 1451, 94 L.Ed.2d 615 (1987); *compare City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (requiring affirmative relief to be supported by a "compelling interest" under a strict scrutiny analysis employed for equal protection cases). Nor is a finding or admission of prior discrimination required in a Title VII case. Indeed, to adopt affirmative measures to resolve Title VII employment discrimination claims, the employer need not admit to any prior discrimination, nor point "to evidence of an 'arguable violation' on its part." *Johnson,* 480 U.S. at 630, 107 S.Ct. at 1451.

■ 66. Under the manifest imbalance standard, an employer is not required to show non-statistical evidence of past discrimination as it would under the *prima facie* standard. *Johnson,* 480 U.S. at 633 n. 11, 107 S.Ct. at 1453 n. 11. There is no doubt that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII. *City of Richmond v. Croson,* 488 U.S. at 501, 109 S.Ct. at 725–26 (quoting *Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741–2742, 53 L.Ed.2d 768 (1977)). A "gross" statistical disparity is where a disparity of 5% exists (equivalent to a one-in-twenty chance of random occurrence) in a relevant job category.[7] "[A] court will infer from the numbers alone that, more likely than not, the disparity was a product of unlawful discrimination," absent strong rebuttal evidence. *Palmer v. Shultz,* 815 F.2d 84, 91 (D.C.Cir.1987); *Segar v. Smith,* 738 F.2d 1249, 1283 (D.C.Cir.1984), *cert. denied sub nom., Meese v. Segar,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Under Title VII, as with constitutionally-based challenges, the burden is on the challenger to rebut the presumption that affirmative relief agreed to by the government is justified. *Johnson,* 480 U.S. at 626, 107 S.Ct. at 1448–49; *Janowiak v. South*

*Bend,* 836 F.2d 1034, 1036 (7th Cir.1988), *cert. denied sub nom., South Bend v. Janowiak,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).

■ 67. A "manifest imbalance" can be shown by statistical evidence alone or through a combination of statistical and anecdotal evidence. *Palmer,* 815 F.2d at 91. Even when the statistical evidence shows less than 1.96 standard deviations, the Court of Appeals for the District of Columbia has held that a *prima facie* case of discrimination can be made relying on anecdotal evidence supporting the statistical showing. *Palmer,* 815 F.2d at 96–97.

■ 68. Under Title VII, affirmative relief may not "unnecessarily trammel" the interests of non-minorities, *United Steelworkers of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729–30, 61 L.Ed.2d 480 (1979), but "innocent persons may be called upon to bear some of the burden of [an] affirmative remedy." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 280–81, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (plurality opinion); *compare Croson,* 488 U.S. at 505, 109 S.Ct. at 727–28 (requiring affirmative relief to be "narrowly tailored" in constitutional cases). Thus, in a Title VII case, affirmative relief need not directly correspond to particular instances of discrimination. *Wygant,* 476 U.S. at 287, 106 S.Ct. at 1853–54; *Local 93 of Firefighters v. City of Cleveland,* 478 U.S. 501, 515, 106 S.Ct. 3063, 3071–72, 92 L.Ed.2d 405 (1986) (citing *Local 28, Sheet Metal Workers' Int'l Ass'n v. Equal Employment Opportunity Comm'n,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)).

■ 69. Relevant factors in determining the proper scope of the affirmative relief include whether it is temporary and limited in nature, *United States v. Paradise,* 480 U.S. 149, 182, 107 S.Ct. 1053, 1072, 94 L.Ed.2d 203 (1987); whether it involves layoffs or less burdensome promotions, *Wygant,* 476 U.S. at 282–283, 106 S.Ct. at 1851–1852; *Howard v. McLucas,* 871 F.2d 1000, 1010 (11th Cir.1989), *cert. denied sub nom., Poss v. Howard,* 493 U.S. 1002, 110 S.Ct. 560, 107

---

7. Stated graphically under a bell-curve, a five percent statistical disparity would measure 1.96 standard deviations under a two tailed test. *See Palmer v. Shultz,* 815 F.2d 84 (D.C.Cir.1987).

L.Ed.2d 555 (1989); *Howard,* 871 F.2d at 1010 (affirmative promotional relief met more strict constitutional requirement that it be narrowly tailored in part because targeted promotions represented only 4.3% of similar promotions made during the same period); and the nature of the employment, *see Paradise,* 480 U.S. at 167 n. 18, 107 S.Ct. at 1064 n. 18 (noting cases suggesting a greater government interest in eliminating possibly discriminatory employment policies in law enforcement, but not reaching issue); *accord Wittmer v. Peters,* 87 F.3d 916 (7th Cir.1996) (Posner, J.) (discussing cases recognizing special nature of law enforcement in approving race-conscious remedies).

70. The Supreme Court's decision in *Croson,* as well as its subsequent decision in *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), may establish a stricter standard. There is some uncertainty as to whether the law of this Circuit requires that the Title VII standard of *Johnson* be applied in a discrimination case against the federal government as opposed to the strict scrutiny analysis required under the U.S. Constitution by *Croson* and *Adarand.* The Supreme Court stated in *Adarand* that, "We hold today that all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny." —— U.S. at ——, 115 S.Ct. at 2112. This issue has been considered by another judge in this District in a quite similar action against the Federal Bureau of Investigation:

> [T]he FBI is a federal agency and, as such, is not subject to the equal protection clause of the Fourteenth Amendment. While the Fifth Amendment has been interpreted as imposing equal protection guarantees similar to those provided by the Fourteenth Amendment, the Court has been unable to find any post-*Croson* cases in which the *Croson* standard has been applied to voluntary race-conscious relief granted by a federal agency in the Title VII context.

*See Johnson et al v. Reno,* C.A. No. 93–0206 (October 4, 1993) (Hogan, J.). This Court, however, does not need to decide whether the agreement meets only the requirements of Title VII, because the Court is satisfied that the Settlement Agreement has an adequate factual predicate to justify race-conscious relief under either Title VII or the U.S. Constitution, as set forth below.

3. *The Evidence Meets the Strict Scrutiny Required For Approval Under Section 108*

71. As an initial matter, the Court notes that the vast majority of the Settlement Agreement is race-neutral, and does not implicate either the *Johnson* or *Croson* standards for racial classifications.

72. All of the class-wide remedies for equitable relief are neutral as to race. For example, the career development system and new promotion assessment system is required to minimize adverse impact on any protected group by virtue of the Settlement Agreement's explicit incorporation of the Uniform Guidelines of Employee Selection Criteria, 29 C.F.R. § 1607. The Agreement carefully notes that the system is supposed to be designed to minimize adverse impact *"inter alia* ... on African–Americans." Settlement Agreement at 20. The Settlement Agreement ensures that the new personnel systems will be fair to all groups. Moreover, the Director of ATF has stated his intentions to apply the provisions of the Settlement Agreement to all protected groups to the maximum extent possible. *See* Exhibit B to Def.Resp.

73. The only provisions of the Settlement Agreement that are even *arguably* race-conscious are the interim promotion procedures, in which African–American Special Agents who are not selected for promotion will have the decision reviewed by a higher level of authority at ATF, and the disciplinary procedures, which require that the decision to commence the investigation of a named plaintiff or African–American agent who has filed an EEO complaint must be approved by the Assistant Director of Inspections. Otherwise, all of the provisions apply equally to all special agents. Even if any of the provisions of the Agreement are considered to constitute racial classifications, sufficient evidence is in the record, as dis-

cussed below, to satisfy the strict scrutiny standard.

74. Plaintiffs have submitted to the Court sufficient statistical evidence that, if believed by a jury, would support their claims of discrimination.

75. Plaintiffs submitted evidence that the Treasury Enforcement Agents Exam ("TEA") had a disparate impact. ·See Plaintiff's Memorandum of Points and Authorities In Support of Motion for Class Certification, filed July 8, 1994 ("Pltfs.Mem.") at 42–43.

76. Plaintiffs submitted evidence that African–American Special Agents of ATF are disproportionately hired through Schedule A hiring. Pltfs.Memo. at 46. Declaration of Charles R. Mann at ¶¶ 9–15 ("Mann Decl.")

77. Plaintiffs submitted evidence that African–American Special Agents of ATF are hired at lower grades and receive less pay than their non-African-American counterparts. Pltfs.Memo. at 54; Mann Decl. at ¶ 21.

78. Plaintiffs submitted evidence that there would have been greater representation in management if African–Americans were hired by ATF at the same rate as they were hired by other law enforcement agencies, and placed in the same initial grade at hire distribution as whites and advanced at the same rate as whites after hire. See Supplemental Declaration of Charles R. Mann at Exhibit 1.

79. Plaintiffs submitted evidence that African–American Special Agents of ATF received statistically significant lower performance ratings throughout the class period. Pltfs.Mem. at 66; Mann Decl. at ¶ 17.

80. Plaintiffs submitted evidence that African–American Special Agents received fewer awards, and of lesser value. See Pltfs. Mem. at 70–74; Mann Decl. at ¶ 18.

81. Plaintiffs submitted evidence that African–American Special Agents were disciplined more frequently. Pltfs.Mem. at 86–89; Mann Decl. at ¶ 20.

82. Plaintiffs submitted evidence that African–American Special Agents were not selected for Acting Supervisor at the same rate as whites. Supplemental Memo at ¶ 5.

83. In addition to the statistical evidence, Plaintiffs submitted approximately 50 affidavits of class members with anecdotal evidence in support of their allegations—over 25% of the entire class. See generally, Declarations of Class Members In Support of Class Certification.

84. Defendant filed a comprehensive Opposition to Class Certification, filed a surreply, and submitted their own expert affidavits in response to this evidence. Plaintiffs' evidence, however, is such that a reasonable finder of fact could have accepted it, and it provides sufficient factual support to satisfy the standards of either *Johnson,* on the one hand, or *Croson* and *Adarand* on the other.

### 4. *The Objections From Non–Class Members To The Settlement Are Not Well–Founded*

#### a. *Form Objections*

85. The Court concludes that the "form objections" from non-class members to the Settlement Agreement are not well taken. First, it appears that many Special Agents submitted these forms because they were misled· by the instructions that accompanied the form objection. The instructions that accompanied that form stated that:

> In order to preserve your right to file any future EEO complaint, grieve, pursue administrative action, or pursue action in Federal court against any instance of discrimination you may suffer from the systems proposed for development by the settlement of *Stewart v. Rubin* (the African–American lawsuit) you must go on record with the court that you object to the provisions of the settlement.

This suggests that a Special Agent waives all future EEO rights if that Special Agent fails to object to the Settlement Agreement. The parties agreed, and the Court rules, that this "advice" is wrong.

86. This Settlement Agreement simply does not (and could not) preclude all future EEO claims by non-class members. The Settlement Agreement has preclusive effect on many claims, not·only by virtue of its own terms, but by virtue of Section 108 of the

Civil Rights Act of 1991. *See* 42 U.S.C. § 2000e–2(n)(1). The Settlement Agreement, however, would not (for example) have preclusive effect on some future claim by a class member (or non-class member) that such person was discriminated against when that person was non-selected pursuant to some future personnel system developed under the Settlement Agreement. Nevertheless, it appears that many Special Agents filed objections under the mistaken belief, fostered by the instructions, that all future EEO claims would be precluded if an objection were not filed. Neither Plaintiff nor Defendant participated in the creation and/or distribution of the so-called, form objection. In fact, no one has taken responsibility for its creation and, as such, its origin remains unknown in this record.

87. In any event, the substantive assertions of the form objection pose no impediment to approving the Settlement Agreement.[8]

88. The form objection first contends that the Settlement Agreement "would try to right past wrongs by awarding money to virtually any claim." Form Obj., at 1.[9] Under the Settlement Agreement, however, all claims for relief, monetary and non-monetary, must be submitted under penalty of perjury, with supporting documentation provided. *See* Settlement Agreement, Appendix B at B–3 to B–4; Appendix C at C–4 to C–5; Appendix G at 17. The procedures also expressly require a claimant to "demonstrate that he or she was discriminated against on the basis of race or retaliation." Appendix B at B–1; Appendix C at C–2 (requiring showing that claimant "was discriminated against

on the basis of race or retaliation"). In addition, all objectively verifiable information will be confirmed by ATF and at least one out of every 10 claims will be audited by class counsel to ensure the veracity of the claim. *See* Settlement Agreement, Appendix B at B–3 to B–4; Appendix C at C–4 to C–5. The Settlement Agreement further provides that "Any claimant who makes a false statement in connection with these claims procedures will be referred to the ATF Office of Inspection and the United States Attorney for the District of Columbia for investigation." *Id.* Accordingly, the Settlement Agreement provides substantial requirements and safeguards to ensure that relief is afforded only to valid claims.

89. The form objection also notes a concern about implementing systems that do not treat all Special Agents equally. This objection is without merit. As part of the Settlement Agreement, ATF has agreed to develop an entirely new promotion assessment system.[10] That system will be developed in accordance with the Uniform Guidelines issued by the U.S. Equal Employment Opportunity Commission, codified at 29 C.F.R. Part 1607, or other professional standards, and any applicable federal laws and regulations. *See* Settlement Agreement at 20–25. Not only must that system minimize adverse impact on African–Americans who are GS–1811 series Special Agents at ATF, but it is clear that the Uniform Guidelines, and/or other professional standards, would generally impose the higher burden of ensuring no statistically significant adverse impact on other protected groups. *See, e.g.,* 29 C.F.R. § 1607.3.[11] Accordingly, the systems to be

---

8. Indeed, portions of the form objection fully support the propriety of settling this matter. The form objection expressly provides:

I recognize that African American special agents have suffered individual acts of discrimination and injustices during their employment with ATF. That these injustices have occurred is inarguable. Financial relief should be awarded to those African American special agents who can document such instances.

Form Obj. at 1. Accordingly, hundreds of *non-class* members have actually identified a perceived need to resolve claims of African–Americans.

9. Even if true, the non-class objectors certainly have no standing to raise such a claim since the

award of monetary relief to class members has no bearing upon them.

10. The job analysis that would be used for developing the new promotion assessment center will also be used to develop other areas of substantial equitable relief, including equitable relief in the areas of performance appraisals, training, transfers, awards and bonuses, and assignment to special teams. *See* Settlement Agreement at 20–25, 27–33.

11. *See, e.g.,* 29 C.F.R. § 1607.3 ("The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any

developed will be fair to *all* Special Agents within ATF. Moreover, the Director of ATF frequently has reaffirmed his commitment to apply the provisions of the Settlement Agreement to all Special Agents to the maximum extent possible. *See, e.g.,* Defendant's Response Exhibit 1, Attachment B at 1–2 (Director's memorandum to all employees). The Court notes that the objectors have *not* challenged the *manner* in which these systems will be developed, which is the key feature of the Settlement Agreement.

90. The form objection also suggests that the Settlement Agreement "would set up systems of advocacy for African–American Special Agents to the intended exclusion of all non-African American Special Agents." Form Obj. at 1–2. There is no support for this objection. The objectors first argue that the Interim Promotion Procedure creates an "advocacy" program. The express terms of Settlement Agreement reveal, however, that this *temporary* procedure simply allows for the further review of a promotion package if a selecting official tentatively determines not to select an African–American Special Agent who is on the best qualified list. *See* Settlement Agreement at 25–27. This interim procedure is also short term—*i.e.,* it will not be used once the new promotion systems are implemented. The temporary nature of the provision is an important factor in support of approval. *See U.S. v. Paradise,* 480 U.S. at 182, 107 S.Ct. at 1072, *Adarand,* —— U.S. at ——, 115 S.Ct. at 2118 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 513, 100 S.Ct. 2758, 2792, 65 L.Ed.2d 902 (1980)). Moreover, nothing in this temporary procedure mandates or even suggests a particular result. The procedure simply requires the further review of promotion packages to ensure fairness. The system is not only fair, but objectors certainly are not precluded from filing an EEO complaint to the extent they are non-selected and believe that the non-selection was the result of discrimination.

91. The form objection also raises concerns about the provision in the Settlement Agreement that requires a review of any decision to commence an investigation against an African–American Special Agent who has filed an EEO complaint less than one year before the commencement of the investigation. *See* Settlement Agreement at 31–32. The objectors, who are not class members, fail to indicate why they have legal standing to challenge this provision or have any legitimate interests in the commencement of investigations against African–Americans. In any event, the provision is fair because it simply allows for the review of a decision to commence an investigation to ensure that the investigation is not the result of an impermissible retaliatory motive.

92. The objectors also contend that class members should not be allowed to obtain a promotion if they had not previously expressed that interest in writing. Form Obj. at 3. *First,* as discussed above, the claims process was designed to ensure the integrity of the process and to recognize only *valid* claims. *Second,* the objectors themselves recognize that a non-promotion claim *could* lie where a non-selectee had not applied, in writing, for the promotion—for example, where the selection involves an automatic zone of consideration,[12] rather than applications. *Id.* Other situations are certainly possible. For example, a class member may be able to establish that the Special Agent's supervisor told the agent not to bother to apply for a particular promotion, since it was intended for someone else. While such a claim may be difficult to establish in terms of proof, it is certainly not impossible. *See, e.g., Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1450–51 (4th Cir.) (discussing "futile gesture" theory), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990). Accordingly, the objectors fail to raise any valid argument concerning this procedure,

race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines. . . .").

**12.** An "automatic zone of consideration" method is periodically used whereby all Special Agents occupying a certain grade and position are eligible for a promotion/reassignment. Such a promotion/reassignment would include a higher level of responsibility, but would not involve a change in grade.

and fail to identify with any particularity how this procedure affects them.

93. The form objection also raises a number of concerns that are styled "objections to purported facts which are the basis for the settlement." Form Obj. at 3–5. A settlement Agreement is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed. *See, e.g., Moore,* 615 F.2d at 1271; *Luevano,* 93 F.R.D. at 86. Generally, a court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof. *See Cotton v. Hinton,* 559 F.2d at 1330; *FMC Corp.,* 528 F.2d at 1173.

94. Specifically, the objectors' factual assertions are unsupported.[13] With respect to the Treasury Enforcement Agent's Exam ("TEA") examination, the form objection is incorrect in asserting that anyone could have easily taken the TEA. The evidence submitted in support of Class Certification indicates that the examination is controlled and administered by OPM, not ATF or the Department of the Treasury. OPM accordingly determines when the test is given—indeed, if there are too many names on the register, the test may not be opened for months or longer. Moreover, Plaintiffs alleged and submitted evidence that the TEA examination had an adverse impact. *See* Pltfs.Mem. at 42–45.

95. The suggestion in the form objection that "African American Special Agents hired through the Schedule A process were provided an added opportunity for employment . . . that others did not have" is unsupported by anything in this record and also ignores the negative aspects of a. Schedule A appointment alleged by Plaintiffs. Employees who were hired under Schedule A did not have the same civil service protection afforded to employees hired under the competitive process and could not compete for promotions above certain grade levels. *See* 5 C.F.R. §§ 6.1, 6.2. Plaintiffs also have alleged in this action that Schedule A status had a stigmatizing effect on African–Americans. *See* Pltfs.Mem. at 50–51. In any event, un-

der the Settlement Agreement, all Schedule A Special Agents who are qualified for conversion will be converted to career conditional status—regardless of whether they are members of the class. Settlement Agreement at 18.

96. The form objection makes several unsupported assertions in an apparent response to some of Plaintiffs' substantive claims in this action. Plaintiffs in this action have claimed, among other things, that African–American Special Agents were hired at grades that were lower than their qualifications warranted, and grades lower than their similarly-situated non-African-American counterparts. Plaintiffs also have challenged, among other things, alleged discrimination in promotions and awards. In response to these claims, the form objection asserts that the "decision to hire an applicant at Grade 5 or 7" was "not random." The objection further states that the "purported facts wrongly imply that promotions and awards should be based upon racial quotas." These arguments are clearly misplaced and misunderstand the nature of the statistical inquiries involved in a class action lawsuit.

97. Plaintiffs in this case allege that African–American Special Agents systematically have been denied the same opportunities as non-African-Americans in various ATF personnel practices. In order to show the alleged pattern and practice of discrimination against African–American Special Agents, Plaintiffs would bear the initial burden of offering evidence adequate to create an inference that ATF's employment decisions were based on discrimination against the class, or that ATF's practices, while facially neutral, created a disparate impact on African–American Special Agents. This burden could be met through a showing of a statistically significant disparity between African–American and non-African-American Special Agents.

98. Proof of a disparity in a class-action disparate treatment case is ordinarily based on a comparison of the proportion of the plaintiff class, in this case African–American Special Agents, eligible for selection who

---

**13.** Even if their assertions are correct, the objectors have failed to indicate how they are specifically affected by any of the remedial provisions of the Settlement Agreement.

were actually selected for promotion (or a similar employment benefit) with the corresponding proportion of eligible non-class members, here non-African-American Special Agents, selected for promotion. *See, e.g., Palmer v. Shultz,* 815 F.2d at 90. Proof that an observed disparity was caused by unlawful discrimination need not be direct: circumstantial evidence that the disparity, more likely than not, was the product of unlawful discrimination will suffice to prove a pattern and practice disparate treatment case. *Id.* (citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). Our Court of Appeals has held that this circumstantial evidence may itself be entirely statistical in nature. *Palmer,* 815 F.2d at 90 (citing *Segar,* 738 F.2d at 1278–79.)[14]

99. In this case, it is clear that Plaintiffs presented both substantial statistical and anecdotal evidence that, if believed by a jury, would be sufficient to impose liability. In addition to the statistical analysis set forth in Plaintiffs' briefing on their Motion for Class Certification, Plaintiffs presented approximately fifty (50) affidavits from class members detailing their anecdotal evidence. Defendant, of course, opposed the statistical and anecdotal evidence in its own briefing. Indeed, the Settlement Agreement represents a compromise between competing views of the statistical and anecdotal evidence. Nevertheless, to the extent a jury were to believe the evidence presented by Plaintiffs, it is clear that there is a "strong basis in evidence for the conclusion that remedial action is necessary." *Croson,* 488 U.S. at 500, 109 S.Ct. at 725; *see also Adarand,* —— U.S. ——, 115 S.Ct. 2097. Accordingly, even if any of provisions of the Settlement Agreement are considered race-conscious, it is

clear, as discussed in more depth above, the Settlement Agreement would meet even strict scrutiny.

100. The form objection also suggests that the parties are under a misunderstanding concerning whether undercover work is limited to African–Americans. Based on the record herein, the parties have never suggested that the issue of undercover work is unique to African–American Special Agents. In fact, based on this record, the problem with undercover work lies in assuring that it is properly recognized and that agents receive diverse training and experience to enhance their job skills and future promotion potential. Both these concerns are addressed in the Settlement Agreement, through the adoption of a new appraisal system and the requirement for Individual Development Plans ("IDPs"). *See* Settlement Agreement at 29–30. Both of these new systems will apply to all Special Agents, not just class members.

101. Finally, the form objections reiterate that the systems should be applied to all Special Agents and should not have an adverse impact on any particular group. Form Obj. at 5–6. As discussed above, the new personnel systems will clearly apply to all ATF Special Agents, whether African–American or non-African-American. Moreover, the parties will develop systems in accordance with the Uniform Guidelines issued by the U.S. Equal Employment Opportunity Commission, codified at 29 C.F.R. Part 1607, and/or other professional standards, and any applicable federal laws and regulations. *See* Settlement Agreement at 20–25. Compliance with these standards will protect against a statistically significant adverse impact on any group of Special Agents. Ac-

---

14. In *Palmer,* the D.C. Circuit concluded that

Title VII provides that if the disparity between selection rates ... is sufficiently large so that the probability that the disparities resulted from chance is sufficiently small, then a court will infer from the numbers alone that, more likely than not, the disparity was a product of unlawful discrimination—unless the defendant can introduce evidence of a nondiscriminatory explanation for the disparity or can rebut the inference of discrimination in some other way.

815 F.2d at 91; *see also Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone in a proper case constitute *prima facie* proof of a pattern or practice of discrimination ..."); *Segar,* 738 F.2d at 1278 ("[W]hen a plaintiff's methodology focuses on the appropriate labor pool and generates evidence of [a disparity] at a statistically significant level, [this evidence will be] sufficient to support an inference of discrimination.").

cordingly, the form objection fails to provide any basis for denying final approval of the Settlement Agreement.

### b. *Remaining Objections*

102. In addition to the 366 form objections from non-class members, discussed above, there are another 20 non-class members who have objected to the Settlement Agreement. The remaining objections, while they do not incorporate the exact language of the form objection, essentially incorporate the same thoughts. None of them poses an impediment to approving the Settlement Agreement.[15]

103. Objectors 1, 8, 11, 12, and 14 all have the same objections and, indeed, all signed one document.[16] These objectors first believe that the claims proceedings pursuant to the Settlement Agreement should be public. The non-public nature of the claims processing and proceedings, however, is consistent with the current regulatory scheme for the processing of EEO complaints, which provides for non-public hearings and treats the entire complaint file as subject to the Privacy Act. *See* 29 C.F.R. Part 1614; EEOC Management Directive for 29 C.F.R. Part 1614. The objectors also contend that the Settlement Agreement "certifies the agency and non-class members as racist." [17] There is no support in this record for such a claim, and, indeed, the Settlement Agreement expressly states that it is not "an admission or statement of wrongdoing by the Defendant." Settlement Agreement at 36.

104. In addition to raising concerns already addressed above, Objectors 3, 16, and 17, who submitted identical objections, believe that the payment to the plaintiff class of a lump sum is inequitable. The objectors fail, however, to indicate how the settlement of the monetary component impacts upon them. Moreover, as discussed above, all claimants must fully demonstrate an entitlement to any of the individual monetary (or injunctive) relief under the Settlement Agreement.

105. Objector 4 does not present any analysis, but simply posits a number of hypothetical questions (*e.g.*, "Is management pleading out to 'benevolent racism?' "), and essentially incorporates his revisions to the language from the form objection, which has already been addressed.[18] Objector 5 similarly incorporated many themes from the form objection, and further details his experience with the agency and indicates that he "has no direct knowledge of discrimination against anyone." These objections pose no barrier to approval.

106. Objector 19 "recognize[s] that individual acts of discrimination against African American Special Agents have occurred," but characterizes the Settlement Agreement as adopting a " 'just fill out a claim and make a lot of money' method." This is incorrect for all of the reasons set forth above.

107. Objector 20 sets forth his personal history with the agency, and discusses the Objector's opinion that the Settlement Agreement will be divisive for the agency. There is nothing in the record which supports this Objector's speculative impressions. In any event, that is a management issue for the agency, not a legal one for this Court. This objection poses no barrier to approval.

108. Other objections provide only curt statements of disapproval. Objector 2 essentially denies that there is discrimination against African–Americans. Objector 7 summarily concludes that the Settlement Agreement violates the Civil Rights Act of 1991,

---

15. For convenience, the Court will refer to the Objections by the number assigned to them by Defendant in its Response. *See* Def.Resp. at Exhibit 2.

16. Objector 10, who is from the same field office as the five listed above, has a very similar objection, except that Objector 10 details his additional views (*e.g.*, "Greed, rather than justice appears to be the driving force behind this agreement.").

17. Objector 13 similarly states that "I believe that the language of the settlement would lead any uninformed reader to conclude that ATF is an agency that regularly discriminates against African American personnel." The Objector then discusses some of the objections raised in the form objection, which have previously been discussed.

18. Objector 18 similarly discusses many of the themes already addressed in the context of the form objection.

Objector 9 believes the settlement is "more politically correct than just," and Objector 15 believes that the Settlement would "be a grave miscarriage of justice for all other races." These objections are unsupported and pose no barrier for approval.

109. Finally, the ATF Hispanic Agents' Association ("Hispanic Agents' Association") has filed an objection (Objector 6). As an initial matter, this organization has failed to provide any information concerning its membership or any information that would support any standing to raise objections on behalf of its membership. Assuming it had standing, however, nothing in the objection presents an obstacle to approval of the Settlement Agreement.

 110. The Hispanic Agents' Association first suggests that it "has not had an opportunity to perform a comprehensive review and analysis of the Settlement Agreement," and accordingly seeks a deferral of the approval of the Settlement Agreement for 180 days. *See* Hisp.Ag.Assoc.Obj. at 2, 9. This request is denied. The Settlement Agreement has been on the public record since July 9, 1996, which has allowed substantial time for any potential objector to "review and analyze" the Settlement Agreement.[19] There is also no support for the Hispanic Agents' Association's suggestion that its membership has only received "limited documentation." *Id.* The agency provided the Settlement Agreement to all current Special Agents, which would include members of the Association. Moreover, the Defendant submitted at the Fairness Hearing— contrary to the argument of the association— a signed receipt of the Settlement Agreement, and its attachments, from the Hispanic Agents' Association's President on July 10, 1996.[20] Accordingly, there is no basis for delaying the approval of the Settlement Agreement.

111. The Hispanic Agents' Association also argues that ATF has "evidenc[ed] a callous indifference to the rights of minorities and a recalcitrant attitude by A.T.F. to revamp a failed system. . . ." *Id.* at 2. In essence, the Hispanic Agents' Association is objecting on the grounds that its members have not been included in the Settlement Agreement. There is no question, however, that the new personnel systems proposed for development will apply to *all* Special Agents and will be developed in accordance with the EEOC-approved Uniform Guidelines, or any other applicable professional standards, federal laws and regulations. *See* Settlement Agreement at 20–25. The Association significantly makes no argument that the changes in ATF's employment practices to be developed will discriminate in any way against them. Any such claim, in fact, would be speculative and premature.

112. The Hispanic Agents' Association also states that the Settlement Agreement will have the "cause and effect" of a quota. *See* Hisp.Ag.Assoc.Obj. at 2. The Hispanic Agents' Association has provided no basis for its conclusory assertion that the Settlement Agreement constitutes a quota, nor is there any such basis. The Agreement expressly states that "No provision of this Settlement Agreement is intended as, or is properly interpreted as constituting, a quota, timetable or goal." Settlement Agreement at 6. Nothing in the Agreement identifies specific numbers of promotions, awards, bonuses, or any other equitable relief. Rather, the Agreement provides for the individualized review of discrimination and retaliation claims, and allows for relief only where the claims are fully supported by the claimant. Accordingly, there is nothing in the Agreement that constitutes a "quota" or anything resembling a quota. Thus, the Hispanic Agents' Association's objections pose no impediment to approving this Settlement Agreement.

---

**19.** The impending settlement of this class action, and the fact that the settlement would include broad equitable relief, has been widely known for quite some time. Moreover, since the Settlement Agreement was filed on the public record, it has been the subject of a great amount of national press.

**20.** Furthermore, while the Association claims that it needs more time to "study" the "evidence," the Court notes that the pleadings and evidence in this matter have been placed in the public record since the filing of this suit in 1990.

## C. *The Motion to Intervene*

### 1. *The Motion to Intervene is Untimely*

113. The Putative Intervenors have moved to intervene as of right pursuant to Fed.R.Civ.P. 24(a). Rule 24(a) provides as follows:

> (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: 1) when a statute of the United States confers an unconditional right to intervene; or 2) when the applicant claims an interest relating to the property or transaction which is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

114. As a threshold matter, this Court determines whether the Putative Intervenors' Motion to Intervene is timely:

> Intervention in a federal court suit is governed by Fed.Rule Civ.Proc. 24. Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be "timely." If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review.

*NAACP v. New York,* 413 U.S. 345, 356–66, 93 S.Ct. 2591, 2598–2603, 37 L.Ed.2d 648 (1973) (footnotes omitted); *see also Moten v. Bricklayers, Masons and Plasterers International Union of America,* 543 F.2d 224 (D.C.Cir.1976).

 115. In deciding whether a particular motion to intervene is timely, the Court will consider four factors:

 a. the length of time the intervenor knew or should have known of her interest in the case;

 b. the prejudice to the original parties resulting from the intervenor's delay;

 c. the prejudice, if any, to the intervenor if the motion is denied; and

 d. any unusual circumstances.

*City of Bloomington, Indiana v. Westinghouse Electric Corp.,* 824 F.2d 531 (7th Cir. 1987) (quoting *United States v. Kemper Money Market Fund, Inc.,* 704 F.2d 389 (7th Cir.1983)); *see also Garrity v. Gallen,* 697 F.2d 452, 455 (1st Cir.1983); *Stallworth v. Monsanto Co.,* 558 F.2d 257, 264–66 (5th Cir.1977).

116. Several courts have denied intervention based upon a finding that the first element—the extent of the Intervenor's knowledge about the underlying lawsuit—was satisfied where the intervenor knew about the underlying lawsuit for less than a year. *Westinghouse,* 824 F.2d at 535 (intervenors knew of underlying lawsuit and of its impact on their supposed interests eleven months before moving to intervene); *United Nuclear Corp. v. Cannon,* 696 F.2d 141 (1st Cir.1982) (denying motion to intervene made eleven months after the filing of well-publicized lawsuit); *NAACP,* 413 U.S. 345, 93 S.Ct. 2591 (motion to intervene filed four months after lawsuit filed was untimely).

 117. In this case, the Putative Intervenors contend that they only knew that their interests were affected one month prior to filing their motion. The Putative Intervenors allege that they did not have "any hint" that the settlement of this case would include the overhaul of the ATF's hiring and promoting policies. Putative Intervenors' Complaint ¶ 6. Thus, the Putative Intervenors contend that they only learned of such broad relief when they each reviewed the Settlement Agreement sometime in July 1996.

118. The Court finds that the record demonstrates that the Putative Intervenors knew, or should have known, that this lawsuit might resolve on the terms and conditions as it has long before July 9, 1996.

119. The Putative Intervenors were put on notice as early as January 15, 1993, upon the filing of the amended complaint, that this lawsuit could arguably impact upon their al-

leged interest because of the broad-based equitable relief which the putative class sought. The amended complaint asked for, among other things, the following relief:

Enter a preliminary and permanent injunction directing defendant to take such affirmative steps as are found by the court to be appropriate to remedy the effects and prevent future occurrences of, the illegally discriminatory conduct alleged herein.

120. The Putative Intervenors certainly cannot contend that they did not know that such relief was sought by the amended complaint. The fact of the lawsuit was highly publicized in the media. *See* Exhibit A to Plaintiffs' Opposition to Motion to Intervene. The lawsuit was of public record, was not filed under seal, and was widely known throughout the ATF. The fact of the filing of the lawsuit was widely publicized in the local media on many occasions and over several years. *See* Exhibits C, D, F & G to Plaintiffs' Opposition to Motion to Intervene. As an attempt to minimize their apparent knowledge of the general relief sought by the plaintiffs in the lawsuit, the Putative Intervenors suggest that they did not appreciate the extent to which their rights would ultimately (and allegedly) be affected.

121. The Court is not persuaded by this argument. The fact that the parties were engaged in extensive and comprehensive settlement negotiations was highly publicized in the national media. *See* Exhibit F to Plaintiffs' Opposition to Motion to Intervene. Those negotiations lasted several years and were obviously comprehensive in nature. Indeed, on October 11, 1994, the Director, in the teletype previously mentioned, advised the Putative Intervenors that the settlement contemplated the design of a "new career development plan and performance appraisal system." By this time, the Putative Intervenors must have understood that the settlement of this lawsuit would arguably impact their rights as they now allege in their motion to intervene.

122. That the Putative Intervenors believe that the Settlement Agreement does not have the "least possible effect on any group of employees," as the Director's teletype advised, does not negate the extent of their knowledge concerning the ultimate settlement. Indeed, the Putative Intervenors were so concerned at this time that they thought about bringing their own lawsuit to challenge the settlement agreement. Specifically, on October 12, 1995, NATA circulated to NATA representatives and ATF agents the Director's teletype messages referred to above. *See* Exhibit G to Plaintiffs' Opposition to Motion to Intervene. As part of that letter, NATA solicited agents to participate in a lawsuit designed to, among other things, attack the Settlement Agreement. No such lawsuit was filed, however. Given these largely undisputed facts, the Court finds that the Putative Intervenors knew long before July 1996 that this case might result in the creation of a new promotion and hiring system which could allegedly impact on their interests and finds that they did not act reasonably or diligently in furtherance of said interests.

123. The Court further finds that the original parties will be prejudiced if intervention is granted. The Court notes that the mediation was time-consuming and involved high officials both in ATF and the Department of the Treasury. *Westinghouse,* 824 F.2d at 535–36 (intervention at late date would render settlement negotiations worthless). Those efforts will be jeopardized if new parties are allowed to join this lawsuit at this late date.

124. Moreover, the Court finds that the parties are prepared to implement the various aspects of the settlement and that intervention would further delay that process. *Id.* at 536 (citing *Culbreath v. Dukakis,* 630 F.2d 15 (1st Cir.1980)).

125. Furthermore, the Court finds that the Putative Intervenors are not prejudiced by the denial of the motion to intervene. In this case, consistent with section 108 of the Civil Rights Act of 1991, the Putative Intervenors had the right to object to the Settlement Agreement at the Fairness Hearing, but chose not to. Similarly, the Putative Intervenors are not prejudiced because their views could be presented as *amicus curiae,* but they declined to present any comments to the Court when specifically asked to at the

Fairness Hearing. *See Dize v. Amalgamated Council of Greyhound Local Unions,* 684 F.Supp. 332, 340 (D.D.C.1988) (in action to enjoin union from continuing to violate its duty of fair representation, local union was prohibited from intervening because of untimeliness but was permitted to file and participate as *amicus curiae* ); *Bradley v. Milliken,* 828 F.2d 1186, 1194 (6th Cir.1987) (applicant's motion for intervention as of right or permissive was denied in school desegregation case, but concerns were considered by inviting appearance as *amicus curiae* ); *Stotts v. Memphis Fire Dep't,* 679 F.2d 579, 584 (6th Cir.) (court gave proposed intervenors the opportunity to present their objections), *cert. denied sub nom., Orders v. Stotts,* 459 U.S. 969, 103 S.Ct. 297, 74 L.Ed.2d 280 (1982); *Penick v. Columbus Education Ass'n,* 574 F.2d 889, 890 (6th Cir. 1978) (per curiam) (participation as *amicus* allowed in school desegregation case). Either way, the Putative Intervenors had a reasonable means to voice their concerns about the Settlement Agreement.

126. The Putative Intervenors have not explained the lateness of their motion other than to say that they did not appreciate the extent of the relief sought until July 1996. Because the Court finds that the record establishes otherwise, the Putative Intervenors have thus failed to demonstrate an unusual circumstance—the fourth element of the timeliness analysis—to justify their motion.

2. *Additionally, The Putative Intervenors Have Not Satisfied Their Burden of Alleging Standing*

▇▇▇ 127. The Putative Intervenors, as putative party plaintiffs, have the burden of alleging facts which establish their standing. *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 264, 111 S.Ct. 2298, 2305–06, 115 L.Ed.2d 236 (1991) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984)).

128. "[A]pplicants for intervention as of right must be able to articulate a 'significantly protectable interest' in the ongoing litigation," and they have not done so if "they cannot state a legally cognizable claim."

*United States v. City of Chicago,* 798 F.2d 969, 976 n. 10 (7th Cir.1986), *cert. denied sub nom., O'Sullivan v. United States,* 484 U.S. 1041, 108 S.Ct. 771, 98 L.Ed.2d 858 (1988); *see Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.,* 840 F.2d 72, 75 (D.C.Cir.1988) (application to intervene should be evaluated in terms of whether the "pleadings allege a legally sufficient claim or defense and not whether the applicant is likely to prevail on the merits").

▇▇▇ 129. To establish an interest in the proceeding, the applicant for intervention must have an interest that is "direct, substantial, and legally protectable." *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 96–97 (2d Cir.1990) (citing *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542–43, 27 L.Ed.2d 580 (1971); *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.,* 797 F.2d 85, 88 (2d Cir.1986); *Restor–A–Dent Dental Labs, Inc. v. Certified Alloy Prods., Inc.,* 725 F.2d 871, 874 (2d Cir.1984)).

130. Furthermore, the "legal rights of non-minorities generally are not adversely affected by *reasonable* and *lawful* race-conscious hiring or promotional remedies." *Kirkland v. New York State Dep't of Correctional Servs.,* 711 F.2d 1117, 1126 (2d Cir. 1983), *cert. denied sub nom., Althiser v. New York State Dep't of Correctional Servs.,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984).

▇▇▇ 131. The Putative Intervenors' sole allegation concerning their standing is as follows:

Each of them [the Putative Intervenors] has standing to intervene as a plaintiff in this case by reason of being *likely to suffer* adverse consequences to his or her professional career, should the proposed Settlement Agreement in this case be approved.

Putative Intervenors' Proposed Complaint ¶ 3 (emphasis added). Nowhere do the Putative Intervenors allege that anyone has actually discriminated against them either in the past or in the present. Thus, the Putative Intervenors have not alleged an injury which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."

*Mountain States Legal Foundation v. Glickman,* 922 F.Supp. 628, 631 (D.D.C.1995) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

132. In this case, the Settlement Agreement between the parties contemplates a process by which studies are undertaken with the goal of creating a new promotion and hiring system which will be fair and equitable to all persons. The Putative Intervenors have not alleged that the Settlement Agreement currently discriminates against them. Rather, the Putative Intervenors only allege "implications" and "intended effects" and then speculate that the new practices are likely to injure their future professional interests. Complaint ¶¶ 9–15. Such speculation about possible future injury is insufficient to give the Putative Intervenors standing in this lawsuit.

133. The Court further finds that the Intervenor NATA has not satisfied its burden of alleging organizational standing for another reason. Before an association may litigate on its own behalf, an association must meet the same standing test that applies to individuals. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). Injury in fact requires more than an allegation of a " 'setback to [an organization's] abstract social interest.' " *American Legal Foundation v. Federal Communications Comm'n,* 808 F.2d 84, 91 (D.C.Cir.1987) (quoting *Havens,* 455 U.S. at 379, 102 S.Ct. at 1124–25). Nor will merely alleging that a law may be violated or a social goal disfavored constitute the required " 'concrete and demonstrable injury to the organization's activities.' " *American Legal Foundation,* 808 F.2d at 91 (citations omitted).

134. Only an injury directed to the organization's "discrete programmatic concerns" will be sufficient to establish injury in fact. *Id.* Courts have found "discrete and programmatic" injury when the organization alleges that the purportedly illegal action requires the group to increase the resources it must devote to programs independent of the organization's lawsuit. *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931

(D.C.Cir.1986) (complaint alleged that illegal conduct by government diminished association's capacity to refer its members to appropriate services). In contrast, courts have denied standing to groups who allege damage only to the organization's overall interests or goals. *American Legal Foundation,* 808 F.2d at 91 (mere interest in enforcement of certain agency policies is insufficient to establish injury in fact); *Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 255 (D.C.Cir.1983) (an allegation of "a vibrant interest in commenting prior to agency action" is not the "deprivation of a procedural right" that can establish injury in fact).

135. Moreover, an organization like NATA must identify at least one injured individual whom the organization seeks to represent. *Health Research Group v. Kennedy,* 82 F.R.D. 21, 26–27 (D.D.C.1979). In order to have organizational standing under Title VII, the organization must identify at least one non-black member who states a *prima facie* case under Title VII.

136. NATA has not alleged any facts which establish its organizational standing. It has not alleged any direct injury to itself. Moreover, it has not alleged actual injury to any of its members, nor has it alleged that it has the authority to represent the interests of other ATF agents.

137. Finally, Intervenor Jorgenson, in the Memorandum in Support of the Motion to Intervene, has indicated that he no longer is employed by ATF. For this reason as well, Intervenor Jorgenson lacks standing.

D. *The Fee Petition of Prather D. Randle, Esq.*

138. The Court has received the fee petition of Attorney Prather D. Randle and opposing papers. Attorney Randle's request for an award of fees in the amount of $227,500 is denied. *First,* the Settlement Agreement fixes the amount of attorneys' fees that defendant is obligated to pay. The attorneys' fees payable under the Agreement are reasonable. *Second,* it appears that Mr. Randle already has been paid over $40,000 by the Plaintiffs. *See* Declaration of Dondi Albritton in Support of Plaintiff's Opposition

to Fee Petition of Prather Randle. In the Court's view, this is a more than reasonable sum to compensate Mr. Randle for his limited contribution to this case as previous class counsel.

139. Lastly, the Court has substantial concerns about the content of the petition on its face and questions whether *any* compensation for Mr. Randle is appropriate. It appears that many of the entries in Mr. Randle's petition relate to two individual cases of Plaintiff Mark Jones that were settled along with an agreement to pay fees submitted within a certain period of time. The record shows, however, that Mr. Randle never submitted his fees to the Agency in a timely manner. *See* Declaration of Michael Riselli.

140. Moreover, it appears that Mr. Randle did little, if anything, to further this litigation during the year-and-one-half he was employed as class counsel. The only pleadings that Mr. Randle ever filed were: 1) Plaintiffs' Combined Motion to Compel Discovery and For An Order Enlarging the Time In Which to Move for Class Certification; and 2) Plaintiffs' Reply Brief in connection with that same motion on June 7, 1991. Mr. Randle repeatedly failed to file motions for class certification within the time period required by Local Rules of this Court, and at the time his employment as class counsel was terminated, the class was facing a motion to dismiss class-wide allegations from Defendant because of Mr. Randle's inaction. *See* Defendant's Motion to Strike Class Allegations, filed May 7, 1991.

141. Even if any compensation were appropriate to Mr. Randle as class counsel, Mr. Randle's fee petition totally fails to provide adequate support for such work, or to differentiate work for the class action from other work. Entries seeking to charge the government for three hours for cocktails and dinner (entry of July 1, 1991) as well block billing of 50 hours on July 29, through August 2, 1991, for, *inter alia*, meeting with selected agents from the Drug Enforcement Administration and the FBI, who are not involved in this case, cause the Court to doubt all of the entries on the petition.

142. Further, there is no support in Mr. Randle's petition for his request for $350 per hour, which is substantially in excess of the *Laffey* rates established in this Circuit. *See Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984).

143. For the foregoing reasons and based upon the entire record herein, the Settlement Agreement will be approved pursuant to Fed.R.Civ.P. 23(e) and Section 108 of the Civil Rights Act of 1991.

The Putative Intervenors' Motion to Intervene will be denied, and the fee petition of Prather Randle will also be DENIED.