**Kevin BALL, et al., Plaintiffs,**

v.

**AMC ENTERTAINMENT, INC., et al., Defendants.**

**No. CIV.A.00–867(GK).**

United States District Court, District of Columbia.

May 3, 2004.

Thomas J. Simeone, Simeone & Miller, Washington, DC, for Plaintiffs.

David K. Monroe, Steven John Fellman, William Francis Krebs, Galland, Kharasch, Greenberg, Fellman & Swirsky, P.C., Elizabeth Elaine Gardner, Washington Lawyers' Committee for Civil Rights & Urban Affairs, Washington, DC, Kelby N. Brick, Marc P. Charmatz, National Association of the Deaf Legal Defense Fund, Silver Spring, MD, for Defendants.

### AMENDED MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs are deaf and hard of hearing individuals residing in the Washington, D.C., metropolitan area. They bring this class action against movie theater operators AMC Entertainment, Inc. ("AMC") and Loews Cineplex Entertainment Corp. ("Loews") (collectively, "Defendants"). Plaintiffs allege that Defendants violate the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. §§ 12101, *et seq.* (1992), by failing to provide them with the reasonable accommodations necessary for full and equal enjoyment of Defen-

dants' services through implementation of captioning and other interpretive aids.[1]

This matter is before the Court on the Joint Motion for Approval of Proposed Settlement ("Joint Motion"). Upon consideration of the Joint Motion, the Proposed Settlement Agreement ("PSA" or "Settlement"), the written comments regarding the PSA, the parties' responses to those comments, the oral comments of witnesses at the Fairness Hearing held on April 1, 2004, the parties' written responses following the Fairness Hearing, and the entire record herein, for the reasons discussed below, the Joint Motion for Approval of Proposed Settlement is **granted** and the PSA is **approved**.

## I. Background

In April 2000, Plaintiffs, who have a disability recognized by the ADA,[2] brought this action alleging that Defendants' failure to provide reasonable accommodations for deaf patrons desiring to see first run movies[3] shown in Defendants' movie theaters violates the ADA. In November 2001, the Court certified this matter as a class action under Federal Rule of Civil Procedure 23(b)(c), thus allowing the Plaintiffs to seek an injunction requiring Defendants "to implement the captions and other interpretive aids" necessary to comply with the ADA, which "includes but is not limited to: (a) open captioning devices and (b) closed captioning devices, such as rear window captioning." Compl. at p.7 and ¶ 15.

---

**1.** The ADA authorizes this private right of action at 42 U.S.C. § 12188(a).

**2.** A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).

**3.** First run movies are shown in commercial release at movie theaters, as opposed to later release on video or DVD for home viewing.

## A. Types of Captioning

Captions are textual descriptions of a film's soundtrack, comprised of the dialogue and descriptions of other sounds.[4] There are two types of captioning, open and closed. Open captions are similar to subtitles—the text is visible to everyone in the theater. Open captioning usually requires special prints of the film, with the captions permanently imposed on the film, that would be presented at special screenings, often mid-week and/or mid-day performances. More recent advances in technology have given rise to digital captioning systems in which the captions are superimposed onto the film at the theater, as needed, and do not require special prints of the films with permanently imposed captions. However, digital captioning is still an open captioning system because when it is used, the captions are visible to all persons in the theater. *See* Pls.' Response to Comments Raised at Fairness Hearing ("FH Response") at 10–11 and Affidavit of Lawrence R. Goldberg ("Goldberg Aff.") at ¶ 4 (providing general descriptions of the DTS–CSS captioning system); Coalition for Movie Captioning's Comments and Opposition to the PSA ("CMC's Opposition") at 4 n.4 (noting that "on-demand" open captioning of films is available through use of a DTS system).

Closed captioning displays the text only to those patrons who require captions, not to all audience members. Rear Window

---

**4.** For general discussion of open, closed, and rear window captioning, *see* Defs.' MSJ Ex. F, Architectural and Transportation Barriers Compliance Board ("ATBC Board") Bulletin # 8: Theatrical Movie Captioning Systems, and Pls.' MSJ Opp'n at 1–3.

Captioning ("RWC") is a specific type of closed caption technology. With RWC-compatible movies, captions are recorded on a computer disc, separate from the movie itself but provided free of charge by the movie studios, that is played simultaneously with regular screenings of the movie. As the movie is displayed on the movie screen, the captions are sent to an LED data panel installed on the back wall of the theater. Patrons then use portable, transparent acrylic panels attached to their seats to reflect the LED captions, allowing the captions to appear superimposed on or beneath the movie screen. The reflective panels are portable and adjustable (usually placed in cup holders attached to seats), enabling patrons using RWC to sit almost anywhere in the theater.

## B. Defendants' Motion for Summary Judgment

In November 2002, after the parties had conducted discovery in this matter, Defendants moved for summary judgment. They argued that the ADA and its implementing regulations did not require their movie theaters to show movies captioned using RWC because such a requirement 1) was explicitly precluded by the Act and Department of Justice ("DOJ") regulations, 2) would change the nature or mix of the goods or services Defendants offer, and 3) would be unduly burdensome. In opposing Defendants' Motion for Summary Judgment, Plaintiffs made it clear that the relief they sought was "installation of RWC in a fair number of Defendants' screens," see Pls.' MSJ Opp'n at 5, and that RWC was an existing cost-efficient technology that would allow deaf persons to attend first run movies without fundamentally altering the nature of movies or

placing an undue burden upon Defendants. In addition to the parties' briefs on summary judgment, the Coalition for Movie Captioning ("CMC") also filed an amicus brief opposing summary judgment.

On February 24, 2003, after full briefing and a motions hearing, Defendants' Motion for Summary Judgment was denied. See Ball v. AMC Entertainment, Inc., 246 F.Supp.2d 17 (D.D.C.2003). The Court found that "neither the ADA nor the DOJ implementing regulations explicitly forbid requiring Defendants' movie theaters to exhibit closed captioned films." Id. at 24. The Court also concluded that

the relief requested by Plaintiffs—installation of RWC in a fair number of Defendants' screens to make closed captions available to deaf patrons for those RWC-compatible movies that Defendants would otherwise show—would allow class members to enjoy the first run movies normally shown by Defendants without fundamentally altering the nature or mix of the service they provide.

Id. at 25. Finally, the Court found there were material facts in dispute regarding Defendants' claim that requiring installation of RWC would constitute an undue burden under the ADA. See id. at 26. In issuing its summary judgment decision, the Court specifically stated that "Plaintiffs' request for open captioning [would] not be considered" because the dispute regarding the installation of RWC had "become the key concern." Id. at 21 n. 13. Thereafter, the parties began settlement discussions to resolve this matter.[5]

## C. The Pending Motion and Fairness Hearing

On December 12, 2003, the parties filed the pending Joint Motion for Approval of

---

5. On March 7, 2003, Defendants filed a motion, pursuant to 28 U.S.C. 1292(b), seeking certification for appeal of the denial of their Motion for Summary Judgment. On April 7, 2003, the Court denied Defendants' certification request. See 4/7/03 Order.

Proposed Settlement. *See* discussion § II.B., *infra,* for details of the PSA. In accordance with Federal Rule of Civil Procedure 23(e), the Motion also included a plan for notifying members of the class about the PSA, as well as a schedule for conducting a fairness hearing. *See* Fed. R.Civ.P. 23(e)(requiring, in class actions, court approval of settlements and notice to class members of proposed settlements); *Moore v. National Ass'n of Securities Dealers, Inc.,* 762 F.2d 1093, 1113 n. 4 (D.C.Cir.1985) (stating that fairness hearings are held under Rule 23(e) in "an effort to ascertain whether the settlement negotiated by class representatives is fair to all class members"). On December 19, 2003, the Court ordered the parties to provide further information about the PSA with regard to attorney's fees, notification of the class, and the process for determining which class members could appear at the fairness hearing. On December 23, 2003, the parties provided the requested information.

On January 11, 2004, the Court preliminarily approved the PSA, approved the parties' plan to provide notice to class members, and scheduled a Fairness Hearing for April 1, 2004. In anticipation of the Fairness Hearing, the Court informed class members of their right to file their "written objection(s) to the proposed settlement and/or a statement of intention to appear and participate in the Fairness Hearing" by March 12, 2004, and stated that only those class members who provided this written notice would be permitted to participate in the Fairness Hearing. 1/11/04 Order at 1, 2.

The Court received 33 written comments that were filed or postmarked by March 12, 2004. *See* Attachment A (copies of those comments received by the Court).[6] Of those comments, 21 were submitted by individual class members and 12 were submitted by deaf advocacy groups (or those people claiming to represent such groups). Because the Court's Order had specifically stated that written "objection(s)" had to be filed, most of the comments (27) submitted focused on specific points of opposition to the PSA and only 5 comments were written in support of the PSA. By March 27, 2003, the parties had responded to these written class member comments.[7]

On April 1, 2004, the Fairness Hearing was held and attended by many class members.[8] The Court began by outlining the relevant standard to be applied in assessing whether approval of the PSA was appropriate. *See* discussion § II.A., *infra.* The Court then considered statements in support of the PSA from Aaron Fudenkes and John Stanton, two of the named Plaintiffs in this matter,[9] and from Gary Thompson of the Alexander Graham Bell Association for the Deaf and Hard of

---

**6.** The Court also received a few comments that were late-filed. Although these late-filed comments are not included in this general summary of the written comments, the Court did read and consider them.

**7.** Plaintiff's Response indicated that the parties had received 45 written comments regarding the PSA. *See* Pls.' Response to Comments (filed 3/25/04) at 1. While the parties received some comments that were not also received by the Court, the class members' general objections to the PSA appear to be the same.

**8.** The proceedings were interpreted in both American Sign Language and real-time transcription services.

**9.** The primary named Plaintiff, Kevin Ball, was unable to appear at the Fairness Hearing due to the birth of his child. *See* Pls.' Notice of Witnesses at Fairness Hearing (filed 3/24/04) at 1. However, Mr. Ball did present an affidavit in support of the PSA. *See* Pls.' Response to Comments Raised at the Fairness Hearing (filed 4/10/04), Affidavit of Kevin Ball.

Hearing, as well as factual testimony from Lawrence R. Goldberg, the co-inventor of RWC. Individuals representing various advocacy groups then presented their statements in opposition to the PSA, followed by comments from individual class members.[10] The Court then instructed the parties to provide written responses to the comments presented at the fairness hearing and indicated that the Court's decision concerning approval of the Settlement would be forthcoming.

## II.  Analysis

The parties have asked the Court to approve the Proposed Settlement Agreement they have reached in this matter. A number of class members have expressed opposition to the terms of that Settlement. Thus, the Court must decide whether approval of the PSA is a fair, reasonable, and adequate resolution of this class action litigation.

### A.  Standard of Review for Proposed Class Action Settlements

■  In this Circuit, there is no single test for determining whether a proposed class action settlement should be approved under Rule 23(e). *Pigford v. Glickman*, 185 F.R.D. 82, 98 (D.D.C.1999). However, at a minimum, courts must assess whether the proposed settlement is "fair, reasonable, and adequate" in relation to the strength of the plaintiffs' case and in comparison with the likely recovery that plaintiffs would have received if the case had gone to trial. *Thomas v. Albright*, 139

F.3d 227, 231 (D.C.Cir.1998); *see also* Manual for Complex Litigation (Third), § 30.42 at 238 (1995) (stating courts must consider whether the proposed settlement "is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are being served if the litigation is resolved by settlement rather than pursued."). Accordingly, courts must consider the facts and circumstances of each case and exercise their discretion to determine whether approval is warranted, while recognizing that the discretion "to reject a settlement is restrained by the principle of preference that encourages settlements." *Pigford*, 185 F.R.D. at 98, 103 (internal quotations omitted).

■  In deciding whether a proposed settlement is fair, reasonable, and adequate, courts in this Circuit have often examined the following factors: "(a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relating to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel." *In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 375 (D.D.C.2002) (citing, in part, *Thomas*, 139 F.3d at 231–33; *Pigford*, 185 F.R.D. at 98–101; *Osher v. SCA Realty I*, 945 F.Supp. 298, 304 (D.D.C.1996); and *Stewart v. Rubin*, 948 F.Supp. 1077, 1087 (D.D.C.1996), *aff'd*, 124 F.3d 1309, 1997 WL 369455 (D.C.Cir. 1997)).

---

10. Cheryl Heppner appeared on behalf of CMC; Jim House appeared on behalf the Deaf & Hard of Hearing Consumer Advocacy Network; Thomas Dowling and Gary Viall appeared on behalf of the Northern Virginia Resource Center for Deaf and Hard of Hearing Persons; Joan Cassidy appeared on behalf of the Potomac Chapter of Association of Late–Deafened Adults; Greg Hlibock appeared on behalf of the Maryland Association of the Deaf; and Kelby Brick appeared on behalf of the National Association of the Deaf.

The following individual class members presented their comments opposing the PSA: Katrina Mansell of Virginia, Rosaleen Crawford of Maryland, and Shane Feldman of Maryland.

### B. Terms of the Proposed Settlement Agreement

The parties have reached a Settlement requiring Defendants to install a total of 6 RWC units in their theaters within 12 months of the approval of the Settlement, and 6 additional units in the next 12 months.[11] Under the PSA, Defendants will install the RWC units in mid-sized auditoriums at specified theaters "selected on the basis of their size, popularity, and geographic dispersion within the Metropolitan Washington, D.C. area." Joint Motion at 5. In addition, each Defendant will purchase 10 RWC reflector screens for each RWC unit installed, which will "be allocated among the [RWC] theaters . . ., with each theater having at least five (5) seat reflector screens available for use by the Plaintiff class." *Id.* at 6.

Under the PSA, Defendants also agree to advertise the availability of RWC captioning for films in the movie listings of area newspapers and on movie-listing websites. In addition, Defendants agree to install one RWC unit in a mid-sized auditorium in each new theater they build, and to transfer any unit installed in a theater that is later closed to another operating theater. Thus, under the Settlement, the Metropolitan Washington, D.C. area would have at least 12 RWC units installed within two years of approval of the PSA, with more RWC units installed as Defendants expand their operations by building new theaters.

In exchange for Defendants' compliance with the PSA, Plaintiffs agree to release Defendants from all claims in this law suit and to forego any future claims against Defendants for relief under the ADA and/or state and local law. The Settlement requires the parties to cooperate in good faith to carry out the PSA and allows the Plaintiffs to bring the Defendants back before the Court for any alleged non-compliance. The Settlement also includes mechanisms for the parties to amend or modify the PSA as needed. Finally, the Settlement stipulates that Defendants will pay Plaintiffs' attorney's fees for bringing this action, including any costs incurred for future resolution of Defendants' alleged non-compliance.[12]

### C. Class Member Comments on the PSA

As explained previously, the Court received numerous written comments, both in writing and at the Fairness Hearing, from class members opposing approval of the PSA, as well as a few comments from those supporting the Settlement. *See* discussion § I.C., *supra.*[13] Many of the class members who presented comments opposing the settlement, both individuals and advocacy groups, presented objections similar to those raised by CMC. CMC's Opposition presented eighteen separate objections to the PSA, which can be grouped into four general categories: 1) the type of

---

**11.** The installation of the RWC units will be split evenly between Defendants AMC and Loews.

**12.** Under the PSA, Plaintiffs' counsel shall receive a total of $260,000 in fees and expenses. In compliance with the Court's December 19, 2003 Order, the parties provided further information regarding the time and expense Plaintiffs' counsel have devoted to this litigation. After examining this information, the Court concludes that the $260,000

figure is a fair one and consistent with the effort Plaintiffs' counsel have exerted in handling this lawsuit, which has included extensive motions practice, a long discovery process, and protracted settlement discussions.

**13.** It should be noted that the January 11, 2004 notice to class members informed them of their right to file written objections to the PSA and did not solicit statements of approval.

captioning, 2) the distribution of theaters and films, 3) Defendants' responsibilities under the PSA, and 4) the nature of future compliance and litigation. *See, generally,* CMC's Opposition.[14]

First, CMC's primary objection to the PSA was the designation of RWC as Defendants' exclusive captioning system, thus precluding Defendants from implementing other technologies, especially open captioning of films. *See* Transcript of 4/1/04 Fairness Hearing ("FH Tr.") at 47:4–13, Test. of Cheryl Heppner (stating CMC's opposition to "locking in any one technology for [Defendants'] theaters in the captioning area … [because Defendants] and the class may be better served if the [PSA] permits the theater to use other captioning systems"); CMC's Opposition at 4 n.4 (discussing other technologies, including open captioned films through use of digital on-demand screen captioning systems). The use of RWC instead of open captioning was also the primary concern of most other class members that presented written and/or oral comments. *See* FH Tr. at 75:5–9, Test. of Rosaleen Crawford (stating that "RWC [ ] is very awkward" and discussing her preference for open captioning); Attach. A, 3/10/04 Letter of Adele Shuart (noting that she did not like the PSA's "plan to provide [RWC] as the sole solution" and that she preferred open captioning). CMC wanted the PSA to allow flexibility in choosing accommodations and to require Defendants to consult with class members to determine the captioning system to install in "new build" theaters, which CMC argues should include existing

theaters subsequently acquired by Defendants in addition to theaters built by Defendants.

Second, some class members wanted the PSA to provide access for people with hearing loss to *all* first-run movies, and thus opposed the PSA's requirement that only approximately 5% of Defendants' movie screens have captioning. Class members also opposed the PSA's designation of mid-size auditoriums for the installation of RWC, arguing that popular movies are often played in large auditoriums first. *See* Attach. A, 3/5/04 Letter of Joan Cassidy. Class members also wanted the PSA to require Defendants to provide more than 10 reflectors per accessible screen. In addition, class members wanted improved geographic and socioecomonic distribution of the 12 screens chosen for initial installation of RWC.

Third, many class members wanted the PSA to explicitly require Defendants to exercise diligence in keeping the captioning systems in good working order, including a specific requirement for replacement of equipment in accordance with manufacturers' estimated life expectancy. In addition, CMC proposed that the PSA be modified to require Defendants to "exercise due diligence" to obtain first-run movies that had available captioning and to pay whatever cost is not unduly burdensome to obtain captioning discs. CMC and others also want to require Defendants to train their employees about the use of any captioning system and to make readily avail-

---

14. At the Fairness Hearing, Cheryl Hepner of CMC "respectfully requested" that if "the Court should grant final approval to the [PSA], … such approved notice include the concerns raised during this proceeding." FH Tr. at 50:10–13. This section thus serves to thoroughly summarize the concerns raised by CMC and other class members. While Defendants have adequately responded to these concerns in their responses to both the written and fairness hearing comments, it is not necessary for the Court to address the specific details spelled out in those responses. *See, generally,* Pls.' Response to Written Comments (filed 3/25/04), Defs.' Response to Written Comments (filed 3/26/04), Pls.' Response to FH Comments (filed 4/10/04), and Defs.' Response to FH Comments (filed 4/12/04).

able marketing announcements about captioned movies. *See* FH Tr. at 77: 23–78:10, Test. of Shane Feldman (describing his problems with using the RWC in the past, including lack of assistance from theater employees).

Finally, many class members wanted to preserve the right to bring future litigation against Defendants and thus opposed the lack of any opt-out provision in the Settlement. CMC's Opposition at 5, ¶ 5 (objecting to "the lack of an 'opt out' provision" and stating a preference that class members "preserve their individual rights under the ADA with respect to [Defendants] in the future"). Similarly, CMC and others wanted formal recognition in the PSA that the class does not include, and thus the Settlement does not apply to, those people not currently residing in the D.C. metro area (i.e., those people who move here or are born here, etc., after the entry of the Court Order). Those class members opposing the settlement also wanted the Court to designate a Master to oversee Defendants' compliance with any settlement approved in this matter.

The Court also received comments from class members supporting the PSA. Those class members noted that while the PSA was not perfect, it was an important first step in "advanc[ing] access to the movies to the deaf and hard of hearing to the extent practically achievable under the ADA." FH Trans. at 40:1–3, Test. of Gary Thompson; *see also* Attach. A, 3/12/04 Letter of Tracie M. Machi (realizing that the PSA "is not a perfect solution and that it will never come close to satisfying *all* hearing impaired or deaf movie goers" but supporting the PSA as "a step in the right direction") (emphasis in original). Class members also noted that they were "tired of waiting" for accessible screens and did not want to delay enjoying movies until after this case went to trial and through

possible appeals. FH Trans. at 15:4–7, Test. of John Stanton. Class members also noted that while the "best system" of accessibility might be open captioning, requiring it "doesn't seem to be realistic" in this case. FH Trans. at 18:1–4, Test. of Aaron Fudenske.

### D. The Proposed Settlement Agreement Is Fair, Reasonable, and Adequate.

■ As the Court noted at the Fairness Hearing, approval of the PSA would be "groundbreaking" because it could serve as a model for other communities to provide deaf and hard of hearing individuals with increased access to first-run movies. FH Tr. at 4:2–5. In fact, this Settlement will provide class members with "greater access to captioned first-run movies than any other deaf and hard-of-hearing community in the United States." Defs.' Response to FH Comments at 7. That fact is of enormous significance.

Thus, many class members who wrote or testified were generally supportive of the PSA, even if they had specific objections to or reservations about it. For example, CMC explicitly stated that it supports the PSA "[t]o the extent [that it] may result in increased accessibility to first-run movies in [Defendants'] theaters." CMC's Opposition at 3. Moreover, while many class members noted a preference for open captioning, there was widespread acknowledgment that settling this case with required installation of RWC would be "better than what we have now" because it would allow class members to see first-run movies with their friends and family. FH Tr. at 75:4, Test. of Rosaleen Crawford. As one father stated, he would like to see popular movies with his young daughter now instead of watching her grow up while he waits for this case to go to trial and appeal in order to possibly obtain open captioning

technology as relief. *See* FH Tr. at 16:21–17:22, Test. of Aaron Fudenske.

While the many comments from class members, both in opposition to and in support of the PSA, are important for the Court's assessment of whether the Settlement is a fair, reasonable, and adequate resolution of this case, the Court's analysis must also consider the terms of the Settlement in light of the strength of Plaintiffs' case, the nature of the settlement negotiations, the posture of the litigation at this time, and the opinions of experienced counsel regarding the PSA. *In re Lorazepam*, 205 F.R.D. at 375. As discussed more fully below, the weighing of these various factors leads the Court to conclude that the PSA should be approved as fair, reasonable, and adequate.[15]

### 1. Settlement Terms in Relation to Plaintiffs' Case

Some class members argue that the PSA is neither fair nor adequate because it requires Defendants to provide RWC while not requiring them to implement other captioning technologies, especially those that provide open captioning. The Court is mindful that many class members prefer open captioning to RWC, *see* FH Tr. at 53:15–25, Test. of Tom Dowling (summarizing the results of a captioning technology test by the Smithsonian Institute in which "virtually all" participants preferred open captioning to new closed caption technologies), and that there is some evidence that the general public would be accepting of open captioning of movies, *see* FH Tr. at 57:6–17, Test. of Gary Viall (noting that hearing audiences enjoyed both captioned and subtitled movies).

However, the fact that some class members prefer open captioning to RWC does not mean that the current PSA should not be approved as fair, reasonable, and adequate. *See In re Vitamins Antitrust Litigation*, 2000 WL 1737867, *2 (D.D.C.2000) (stating that when determining whether to approve a proposed settlement, courts must determine "whether the settlement is adequate and reasonable and not whether a better settlement is conceivable" (internal quotations and citation omitted)). That is particularly true here, where some class members prefer a technology that may not even be required under the ADA.[16] Many of the comments of class members, virtually all of whom were not lawyers, simply did not address the salient legal problem that under the ADA, its legislative history, its implementing regulations, and the relevant case law, Plaintiffs would likely fail at trial if they sought to require Defendants to provide open captioning. Pls.' Response to MH Comments at 4–6; *see also* Defs.' Response to MH Comments at 4 and n.5 (stating that "open-

---

**15.** While many class members asked the Court to require that the PSA include additional favorable specific provisions, under Federal Rule of Civil Procedure 23(e), the Court may only approve or disapprove a proposed settlement—it cannot force the parties to agree to specific benefits and/or detriments they will receive under the Settlement. Thus, if the Court does not approve the PSA, the parties will be forced to engage in further litigation or renegotiate the terms of their agreement.

**16.** Likewise, the class members' request for an opt-out provision is inconsistent with the nature of the injunctive relief sought in this case because if the PSA is approved, Defendants could not restrict any members who chose to opt-out from utilizing the RWC technology implemented. *See Eubanks v. Billington*, 110 F.3d 87 (D.C.Cir.1997) (discussing the appropriateness of opt-out provisions only in those class actions seeking both injunctive relief *and* monetary damages, where the opt-out provision applied only to the monetary damages portion of the agreement).

ing captioning is not a realistic alternative under the ADA").

While this Court concluded in its previous ruling that closed captioning can be required under the ADA, the Court did *not* rule that the ADA requires Defendants to provide open captioning in their movie theaters. *See Ball*, 246 F.Supp.2d at 21 n. 13. No other court considering the issue of captioning in commercial movie theaters has ruled that movie theaters are required to provide open captioning under the ADA. *See* Pls.' Response to Written Comments at 6 (citing *Robert Todd v. AMC*, No. H-02-1944 (S.D.Tex. Aug. 6 2003) and *Cornilles v. Regal Cinemas*, 2002 WL 31469787 (D.Or.2002)). In fact, one court has even concluded that the ADA does not require movie theaters to provide RWC—the very accommodation that Plaintiffs would receive under this Settlement. *See Cornilles*, 2002 WL 31469787 at *1. Finally, in enforcing the ADA, the DOJ has not required companies in the entertainment industry to provide open captioning and has agreed to settle enforcement actions with agreements providing for the installation of RWC, suggesting that the DOJ does not believe that the ADA requires installation of open captioning. *See Ball*, 246 F.Supp.2d at 23 n. 15 (referring to the DOJ's recent settlement of an ADA action against the Disney Corporation).

If this case were to proceed to trial, Plaintiffs would be required by the ADA to identify a specific accommodation they seek as relief. Recognizing the difficulty that they would have at trial in pursuing a requirement of open captioning in Defendants' movie theaters, Plaintiffs negotiated with Defendants to select an appropriate accommodation technology in developing the PSA. The parties decided that the provision of RWC would best serve the class's needs given that RWC is the closed captioning system with the most available movies, positive user reviews, movie studio acceptance, and the ability to make any showing of a movie in an RWC-equipped theater available to class members. *See* Pls.' Response to Written Comments at 6–10.

It is undisputed that this Settlement will provide class members with "greater access to captioned first-run movies than any other deaf and hard-of-hearing community in the United States." Defs.' Response to FH Comments at 7; *see also* Pls.' Response to FH Comments at 15 (noting that the PSA "will put the Metropolitan Washington Area in the unique position of having more access to captioned movies than any other city in the world").[17] Given the great uncertainty about Plaintiffs' chances of success at trial in requiring Defendants to provide open captioning, and the undeniable increase in class members' access to movie theaters under the PSA, the Court concludes that the terms of the PSA should be approved because they are fair, reasonable, and adequate in relation to the strength of Plaintiffs' case. *See Thomas*, 139 F.3d at 231 (stating that courts "should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial").

## 2. Nature of the Settlement Negotiations

As for most of the class members' other objections to the specific terms of the PSA,

---

**17.** While a number of class members discussed the impending installation of different digital captioning systems in the United Kingdom, *see, generally*, MH Tr. at 66–71, Test. of Kelby Brick, and at 79, Test. of Shane Feldman, it must be noted that the ADA is not the law governing such installation in the United Kingdom, and the Court has not been provided with any evidence that other communities in the United States are implementing extensive open-captioning systems in movie theaters.

the Court emphasizes that the Settlement is the product of "protracted arm's length negotiations spanning more than two and one-half years." Joint Motion at 10. As such, the PSA contains many compromises inherent in any settlement negotiation process between opposing parties. For example, with regard to the requirement that Defendants install RWC units in newly built, but not newly acquired, theaters, Plaintiffs state that while they "sought to maximize the number of screens" that Defendants would have to equip with RWC, the parties had to compromise because Defendants were not willing to commit to installing a speculative number of RWC units based on future acquisitions. Pls.' Response to [Written] Comments on PSA at 13–14. Similar compromises had to be made in formulating almost all aspects of the PSA. *See* Defs.' Response to FH Comments at 7 Defendants (noting that the PSA "reflects a considered and reasonable compromise between the parties after four years of litigation"). In any event, as Defendants note, it is in their self-interest to respond to any "obvious economic incentive" to provide further relief to the class if there is "sufficient demand." Defs.' Response to FH Comments at 6–7.

Given the extensive negotiations in this matter and the total absence of any evidence of collusion between the parties, the Court concludes that the PSA is clearly the result of arms-length negotiations, *In re Lorazepam*, 205 F.R.D. at 375, and should thus be approved as "presumptively fair, reasonable, and adequate." *In re Vitamins Antitrust Litigation*, 305 F.Supp.2d 100, 104 (D.D.C.2004); *see also Vista Healthplan, Inc. v. Bristol–Myers Squibb Co.*, 287 F.Supp.2d 65, 66 (D.D.C. 2003) (finding that approval of a settlement was warranted because it "was not the product of collusion between Plaintiff and Defendants or their respective counsel, but rather was the result of *bona fide* and arm's length negotiations conducted in good faith between [the parties]").

### 3. Stage of Litigation Proceedings and the Opinions of Experienced Counsel

In assessing the timeliness of a proposed settlement, another court in this District found that when parties agreed to a settlement after being fully aware of their litigation positions but before trial, it was neither "too early to be suspicious nor too late to be a waste of resources ... [and was] in fact at a desirable point ... to resolve these issues without further delay, expense, and litigation." *In re Vitamins Antitrust Litigation*, 305 F.Supp.2d at 105.

In this case, the parties have undertaken thorough discovery, have engaged in extensive motions practice, and have participated in both court-sponsored mediation and private settlement discussions over the past four years. In addition, given the Court's trial calendar, this case could not be set for trial before the summer of 2005, and there would undoubtedly be lengthy appeals of any trial decision. Thus, without approval of the PSA, it is unlikely that class members would be provided with the accommodation they seek anytime in the next two to three years, if at all. In contrast, the Settlement requires Defendants to almost immediately implement a type of accommodation sought in the Complaint.

It is also undisputed that both parties are represented by counsel with "considerable experience in and expertise in class actions and disability rights litigation." Joint Motion at 11; *see also* 11/9/01 Mem. Op. (certifying the class in this matter, in part, because "Plaintiffs' counsel are sufficiently experienced and competent to vigorously prosecute the case on behalf of all

class members").[18] These experienced counsel have both endorsed the PSA as fair, reasonable, and adequate. *Id.* at 10. The experience of counsel, their endorsement of the settlement, and the overall nature of their negotiations in this matter "also weigh in favor of approving the Settlement." *In re Baan Co. Securities Litigation,* 284 F.Supp.2d 62, 66 (D.D.C.2003).

Accordingly, the Court finds that both the timing of the Settlement and the endorsement of the PSA by the parties' experienced counsel indicate that the PSA should be approved as a fair, reasonable, and adequate resolution of this matter.

### III. Conclusion

It is safe to say that most of America loves "the movies" and loves the experience of attending them with family and friends. The Court understands and is very sympathetic to the strong feelings of class members who criticize the PSA because it does not offer them the open captioning that would make their movie-going experience as fully enjoyable as it is for those who are not deaf or hard of hearing. However, what those class members really seek is total victory in this litigation. That is simply not what a settlement provides. By definition, a settlement gives each party some of what they are fighting for and gives no party everything they are fighting for. In this case, the class members who are unhappy with the PSA, and the Court recognizes that most of them are not lawyers, totally ignore the fact that not only are they seeking total victory, but that it is very doubtful that the ADA can provide them with the open captioning that represents total victory.

18. None of the comments received by the Court questioned the experience or expertise

What this Settlement can—and does—provide is an enormous step forward towards improving the quality of life of hearing-impaired people and their family and friends. Not only will it provide "greater access to captioned first-run movies than any other deaf and hard-of-hearing community in the United States," Defs.' Response to FH Comments at 7, but it will set the standard for what other communities, at a very minimum, should be offering to all those who love what is a quintessentially American art form. Counsel have worked conscientiously, diligently, and creatively to negotiate their differences and they have reason to be proud of their achievement.

Accordingly, the Court concludes that the Proposed Settlement Agreement presented by the parties is a fair, adequate, and reasonable resolution of this matter. The Joint Motion for Approval of Proposed Settlement is **granted**, and the Settlement is **approved**. An Order will issue with this Opinion.